366 P.3d 1058

Leah CASTRO, individually and as Personal Representative of the Estate of Briandalynne Castro, deceased minor, Plaintiff–Appellee,

v.

Leroy MELCHOR, in his official capacity; Wanna Bhalang, in her official capacity; Tomi Bradley, in her official capacity; State of Hawai'i; and Hawaii Department of Public Safety, Defendants–Appellants,

and

Amy Yasunaga, in her official capacity; Roberta Marks, in her official capacity; Kenneth Zienkiewicz, M.D., in his official capacity; and Keith Wakabayashi, in his official capacity, Defendants–Appellees,

and

John Does 1–10; Jane Does 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; And Doe Entities 1–10, Defendants.

No. CAAP–12–0000753.

Intermediate Court of Appeals of Hawai'i.

Jan. 29, 2016.

Marie Manuele Gavigan, Henry S. Kim, Deputy Attorneys General, on the briefs, for Defendants–Appellants.

Sue V. Hansen, Honolulu, Charles W. Crumpton, (Crumpton & Hansen), on the briefs, for Plaintiff–Appellee.

NAKAMURA, Chief Judge, FUJISE and LEONARD, JJ.

Opinion of the Court by LEONARD, J.

Defendants–Appellants Leroy Melchor (**Melchor**), Wanna Bhalang (**Bhalang**), Tomi Bradley (**Bradley**), the State of Hawaiʻi, and the Hawaiʻi Department of Public Safety (**DPS**) (collectively, **the State**), appeal from the Circuit Court of the First Circuit's (**Circuit Court's**) Judgment Pursuant to Findings of Fact, Conclusions of Law and Order (**Judgment**) filed on July 31, 2012, and challenge the Circuit Court's Findings of Fact and Conclusions of Law and Order filed May 14, 2012 (**FOFs COLs and Order**).[1]

This wrongful death action arose out of the allegedly inadequate medical care provided to Plaintiff–Appellee Leah Castro (**Castro**) while she was incarcerated at the Oahu Community Correctional Center (**OCCC**). After a non-jury trial, the Circuit Court found that Castro's baby, Briandalynne Castro (**Briandalynne**), was stillborn as the result of the State's negligence. Castro was awarded $250,000 in damages for negligent infliction of emotional distress (**NIED**) and $100,000 for loss of filial consortium, and Briandalynne's estate was awarded $250,000 for, *inter alia*, the loss of enjoyment of life.

On appeal, the State argues, *inter alia*, that: a wrongful death claim may not be brought on behalf of an unborn fetus under Hawaiʻi's wrongful death statute; the Circuit Court erred by finding that the State was negligent and that its negligence was the legal cause of Briandalynne's death; and that even if negligence has been proved, the damages awarded were speculative and improper. We affirm.

## I. BACKGROUND FACTS

### A. Procedural History

On July 30, 2009, individually and as the personal representative of Briandalynne's estate, Castro filed her First Amended Complaint[2] against the Defendants–Appellants, as well as Amy Yasunaga (**Yasunaga**), Roberta Marks (**Marks**), Kenneth Zienkiewicz (**Zienkiewicz**), and Keith Wakabayashi (**Wakabayashi**), in their official capacities. Count I of the complaint alleged that Melchor, Bhalang, Bradley, and Yasunaga, who were nurses at OCCC, failed to provide proper medical care to Castro and Briandalynne. The State of Hawaiʻi and DPS were alleged to be negligent in training, supervising, and/or retaining their defendant employees, and also vicariously liable for their negligence as they were acting within the scope and course of their employment. Count I also alleged that the defendants' negligence and/or gross negligence was the legal cause and/or substantial factor in Briandalynne's death and Castro's mental and emotional distress. Count II alleged intentional and negligent infliction of emotional distress to Castro by all defendants except the State of Hawaiʻi and DPS.

On March 24, 2011, the defendants filed a motion for summary judgment. On October 14, 2011, the Circuit Court entered an Amended Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment (**Amended Summary Judgment Order**).[3] The court granted summary judgment as to all claims against Yasunaga, Marks, Zienkiewicz, and Wakabayashi, but denied summary judgment in all other respects. A jury-waived trial began on February 27, 2012.

---

**1.** The Honorable Karen T. Nakasone presided.

**2.** Castro's original complaint was filed on May 6, 2008.

**3.** The October 14, 2011 Amended Summary Judgment Order overruled in part a previous May 13, 2011 Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment. The May 13, 2011 order granted summary judgment as to all claims against Yasunaga, Marks, Zienkiewicz, and Wakabayashi, and as to all claims brought by Castro on behalf of Briandalynne's estate, and denied the defendants' motion for summary judgment in all other respects.

## B. Testimony at Trial

### 1. Castro's pregnancy, incarceration and stillbirth

Castro was pregnant when she entered OCCC as an inmate on May 29, 2007.[4] She had not previously received any prenatal care and admitted to using "ice" during the first two months of her pregnancy. According to Castro, the baby's father was Castro's biological father. Castro had never been pregnant before. When she was admitted to OCCC, she did not immediately tell OCCC's medical unit that she was pregnant. Castro said her reason for not revealing her pregnancy was that it was embarrassing. It appears from her testimony that she also felt pressure from police officers and inmates who were friends with her father to not reveal the pregnancy.

On June 29, 2007, Castro was transferred to the Federal Detention Center (**FDC**) where a pregnancy test revealed her pregnancy. As the FDC would not house pregnant inmates, Castro was sent back to OCCC. On July 2, 2007, she saw Yasunaga, a nurse at OCCC. Yasunaga testified that she referred Castro to Kapiolani Medical Center for prenatal care and for an ultrasound. However, although she was transported to Kapiolani, Castro was told that her appointment had been cancelled. To her knowledge, another appointment was never scheduled.

After she had been sent back to OCCC from the FDC, Castro was placed in what was known as a lockdown cell. While in lockdown, Castro began to experience spotting and what she described as light pinkish discharge. She asked Adult Corrections Officer (**ACO**) Hattie Reis (**Reis**) if bleeding or spotting during pregnancy was normal. Castro stated "to my understanding from what ACO Hattie told me was that medical had said that only if I was bleeding I guess more and if I was cramping then to notify them again." Castro estimated that she talked to Reis about three times about her bleeding. Each time she spoke to Reis, Reis would tell her that Reis had spoken to a nurse and "it was the same, same response. 'Is the pad saturated?'" Castro did not receive medical care after speaking with Reis for the third time.

Castro also asked ACO Wanda Nunes (**Nunes**) if her bleeding was normal. Castro testified that the response that Nunes related from the medical unit was "that if the pad wasn't completely saturated, or in her words, if I wasn't bleeding more or cramping, then ... medical was not going to take me."

After speaking to Nunes, Castro told ACO Reyetta Ofilas (**Ofilas**) about her bleeding "once or twice". Ofilas asked her if she was cramping and if the pad was saturated, which Castro understood to be questions coming from the medical unit. No medical care was provided through Ofilas.

Describing her bleeding, Castro said that "the spotting started getting excessive probably about a week after of just spotting. And then it was blood. And then about a week before I got transferred to [Women's Community Correctional Center (**WCCC**)] it went back to spotting again."

While she was bleeding, Castro had been to the medical unit of OCCC for a medication called Seroquel which she took for post-traumatic stress disorder (**PTSD**) and anxiety. She did not tell her psychiatrist or psychologist about her bleeding. Nor did she tell the nurse who delivered Seroquel to her cell about her bleeding.

Castro was transferred to the women's prison, WCCC, on August 2, 2007. She was housed in the segregation area. Her bleeding had stopped by the time she went to the WCCC, but she was still experiencing discharge. However, by the third day after she arrived at the WCCC, Castro's stomach felt hard, she could not feel the baby kicking, and she felt sick after eating. Castro used an intercom to call an ACO named "Sula" and told her that her baby had not been moving for about three days. A nurse came to see Castro and told her a midwife would be seeing her on Friday. The interaction with the nurse occurred on a Tuesday or Wednesday.

4. Unless otherwise noted, this portion of the background facts is primarily based on Castro's trial testimony.

Castro was seen on that Friday and was told that her baby's heartbeat could not be found and she needed to be taken to the hospital immediately. The midwife who saw her, Joann Amberg (**Amberg**) testified that this visit occurred on August 10, 2007. Castro was rushed to the hospital where she learned that her baby was dead. Labor was induced and Castro gave birth to a stillborn baby. An autopsy authorization shows that the stillbirth occurred on August 11, 2007.

## 2. The expert testimony

Dr. Jeffrey Killeen (**Dr. Killeen**) was qualified as an expert in anatomic and clinical pathology. Dr. Killeen performed an autopsy on Briandalynne on August 14, 2007. Dr. Killeen reported that no "gross congenital anomalies" were found during the autopsy. He stated that in "[s]omewhere between probably 25 and 50 percent of [stillbirth] cases you can't find a specific cause of death." In this case, he did not have a "specific cause of death" but could come up with a "likely scenario" meaning a cause of death that was at least 51% likely. His opinion was that the likely cause of death was an abruption, meaning "a separation of the placenta from the uterus so that there is a—kind of a disconnect between the maternal blood supply and placental nutrition from the maternal circulation." He concluded that an incestuous or consanguineous partnership was "a complete non-factor in the death of the fetus."

Dr. Killeen estimated that the age of the fetus was thirty-five to thirty-seven weeks. With regards to the time of death, Dr. Killeen opined: "[I]t appeared that it was most likely that the fetus had been dead at least 96 hours, very likely at least one week but very likely less than two weeks at the time from fetal death to delivery."

Dr. Theodore Hariton (**Dr. Hariton**) was qualified as an expert in obstetrics and gynecology. He opined that "the prenatal care that Ms. Castro got was totally inadequate and below the standard of care." He identified two instances where the standard of care was not met: first, "the initial July 2nd visit with the nurse practitioner in which she did not do a prenatal exam" and second, "when

[Castro] had the bleeding episodes in the last week or so of July, ... she reported to the guards, the guards reported to the medical facility, and no action was taken."

With regards to the first instance, Dr. Hariton stated that if a complete exam had been done and ultrasounds and a prenatal lab had been completed, "this case should have been classified as a high risk pregnancy ... she would have had an excellent chance of having a good baby." As to the second instance, "[p]robably at least July 25th or later the baby could have been saved if she had had an obstetrical consultation." Dr. Hariton was asked: "Had the medical personnel at [OCCC] followed the standard of care under these circumstances, would that have prevented the baby's death?" Dr. Hariton replied: "Yes."

Dr. Hariton opined that the "medical cause of death was placental insufficiency. The placenta was no longer able to carry the pregnancy. It didn't have enough oxygen or nutrition for the baby to survive." He further stated: "Why wasn't it supplying it? ... [T]hat would be a placental separation of some sort." Responding to Dr. Greigh Hirata's (**Dr. Hirata's**) opinion that "the death could be because of incest," Dr. Hariton stated "there's no medical evidence for that anywhere. I've not only reviewed the literature, I've gone to medical libraries, I've gone to perinatologists, gone to colleagues, and nobody's ever heard of a stillbirth related to incest."

Dr. Hirata was qualified as an expert in obstetrics and gynecology, in the area of maternal fetal medicine, and in medical genetics. His opinions were formed after reviewing Castro's medical records, depositions from various "people involved in the correctional facility," and letters from other expert witnesses. Dr. Hirata disagreed with Dr. Hariton's opinion that "had an obstetric consult and ultrasound been accomplished after the initial visit on July 2nd of 2007, [Castro] would have been treated as a high risk pregnancy and would have had a successful delivery." He also testified that while it is possible to detect abruptions on ultrasounds, "most abruptions are not detectable on ultrasound." Dr. Hirata "found no evidence in

the review of [Castro's] records that she had an abruption."

As to the cause of the stillbirth, Dr. Hirata opined "based on the exclusion of all the other common causes of still birth, the most likely cause would be a result of the consanguineous pregnancy." He testified that:

> There is an article from the American Journal of Human Genetics that looked at the outcomes of patient—of offspring from related couples. And in patients and offsprings of a father-daughter, or mother-son, or brother-sister relationship, a first degree relative, it's estimated that 32 percent of patients that were delivered alive .... would have either passed away, or would have significant mortality and morbidity.... So if I would assume, like every other model with genetic disorders, that it's probably worse, a higher loss rate before delivery than after birth.

Dr. Hirata believed that the OCCC health unit met the standard of care as to Castro.

## C. The Circuit Court's Rulings

The Circuit Court entered the FOFs, COLs and Order on May 14, 2012. The court found that the State had been negligent by breaching the applicable standards of care as to Castro and that its negligence was the legal cause of death of the baby and Castro's injuries and damages. The court awarded Castro $250,000 in damages for NIED and $100,000 for loss of filial consortium. Briandalynne's estate was awarded $250,000 in damages for loss of life and for all of the damages she would have been entitled to had she been alive, including the loss of enjoyment of life. The Judgment was filed on July 31, 2012, and the State timely appealed on August 29, 2012.

## II. POINTS OF ERROR

The State alleges the following points of error on appeal:

(1) The Circuit Court clearly erred in FOFs 12, 15–17, 28, and 29, because the court found that the State did not follow DPS and OCCC policies and procedures for medical care for segregated inmates;

(2) The Circuit Court clearly erred in FOFs 23–25, 27, 31, and 41–50, and COLs 70–74, because the Circuit Court found that the State was negligent and there was no credible evidence as to the cause of death of the baby or that she could have survived even if she had been born alive; in addition, there was no credible evidence to support FOF 56 that the fetus was normal;

(3) The Circuit Court erred in its award of damages to Briandalynne's estate because Castro had not pled a surviving negligence claim on behalf of the estate; in addition, even if a claim was properly raised, there was no credible evidence that the fetus was viable and/or had a right to bring a negligence claim;

(4) The Circuit Court clearly erred in FOFs 60, 61, 63, 64, and 66, and COLs 77 and 81–83, insofar as the court awarded damages because causation was not proved and/or the damages awarded were speculative and improper; and

(5) The Circuit Court erred in denying the State's motion for summary judgment as to claims on behalf of Briandalynne's estate because a fetus is not a "person" under Hawai'i's wrongful death statute.

## III. APPLICABLE STANDARDS OF REVIEW

"In this jurisdiction, a trial court's FOFs are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed." *Chun v. Bd. of Trs. of the Emps.' Ret. Sys. of the State of Hawai'i*, 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005) (citations and internal quotation marks omitted) (quoting *Allstate Ins. Co. v. Ponce*, 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004)). "An FOF is also clearly erroneous when the record lacks substantial evidence to support the finding. [The Hawai'i Supreme Court has] defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999) (citations, internal

quotation marks, and brackets omitted) (quoting *State v. Kotis,* 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999)).

A COL is not binding upon an appellate court and is freely reviewable for its correctness. [The appellate court] ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

*Chun,* 106 Hawai'i at 430, 106 P.3d at 353 (citations, internal quotation marks, and brackets omitted) (quoting *Allstate Ins. Co. v. Ponce,* 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004)).

"On appeal, the grant or denial of summary judgment is reviewed *de novo.*" *Nuuanu Valley Ass'n v. City & Cnty. of Honolulu,* 119 Hawai'i 90, 96, 194 P.3d 531, 537 (2008) (citations omitted).

## IV. DISCUSSION

### A. Wrongful Death of an Unborn, Viable Fetus

Hawai'i's wrongful death statute is codified in Hawaii Revised Statutes (**HRS**) § 663–3 (Supp.2015) and states, in part:

(a) When the death of a person is caused by the wrongful act, neglect, or default of any person, the deceased's legal representative, or any of the persons enumerated in subsection (b), may maintain an action

against the person causing the death or against the person responsible for the death. The action shall be maintained on behalf of the persons enumerated in subsection (b), except that the legal representative may recover on behalf of the estate the reasonable expenses of the deceased's last illness and burial.

The State argues, *inter alia,* that there is no legal authority allowing a claim on behalf of Briandalynne's estate because Briandalynne was not a "person". The Circuit Court rejected this argument when it granted summary judgment as to all claims against Yasunaga, Marks, Zienkiewicz, and Wakabayashi, but denied summary judgment in all other respects, including the claims brought on behalf of Briandalynne's estate. After trial, in COL 74, the court concluded that "[u]nder Hawai'i's wrongful death statute, a parent of a stillborn viable fetus, such as Plaintiff herein, is entitled to sue for the wrongful death of the fetus. *Wade v. U.S.,* 745 F.Supp. 1573, 1579 (D.Haw.1990)."

The issue of whether a wrongful death claim may be brought on behalf of a stillborn fetus, which had been viable before death, has not been addressed previously by the Hawai'i appellate courts; nor does a review of the legislative history of HRS § 663–3 reveal whether or not the Legislature intended the statute to apply to unborn children.[5] It appears, however, that only six states— California, Florida, Iowa, Maine, New Jersey, and New York—prohibit wrongful death claims from being brought on behalf of unborn children.[6] On the other hand, forty-one states and the District of Columbia permit wrongful death actions to be brought on behalf of unborn, viable fetuses.[7] Of these,

---

5. The United States District Court for the District of Hawai'i has interpreted Hawai'i's wrongful death statute as allowing the parents of a stillborn viable fetus to sue for its wrongful death. *Wade v. U.S.,* 745 F.Supp. 1573 (D.Haw.1990). While the state courts are the final arbiters of state law, the interpretations of federal courts can be persuasive. *See, e.g., AlohaCare v. Ito,* 126 Hawai'i 326, 349 n. 40, 271 P.3d 621, 644 n. 40 (2012), *Rana v. Bishop Ins. of Haw., Inc.,* 6 Haw.App. 1, 10, 713 P.2d 1363, 1369 (1985).

6. *See Justus v. Atchison,* 19 Cal.3d 564, 139 Cal. Rptr. 97, 565 P.2d 122 (1977), *disapproved of on other grounds by Ochoa v. Super. Ct.,* 39 Cal.3d 159, 216 Cal.Rptr. 661, 703 P.2d 1 (1985); *Stern*

*v. Miller,* 348 So.2d 303 (Fla.1977); *Dunn v. Rose Way, Inc.,* 333 N.W.2d 830 (Iowa 1983) (although a wrongful death recovery on behalf of a viable, unborn child was not allowed because such a child was not a "person," it was a "minor child" so that its parents could recover for loss of services of a minor child); *Shaw v. Jendzejec,* 717 A.2d 367 (Me.1998); *Giardina v. Bennett,* 111 N.J. 412, 545 A.2d 139 (1988); *Endresz v. Friedberg,* 24 N.Y.2d 478, 301 N.Y.S.2d 65, 248 N.E.2d 901 (1969).

7. The word "viable," as used in most of the judicial decisions and as used in medical parlance, refers to the stage of prenatal development at which a fetus would be capable of independent

thirty-five jurisdictions first recognized such a claim by judicial decision, while fourteen states now expressly allow such a claim by statute.[8] We find compelling reasons to join this overwhelming majority.

We first address the State's argument that it would be inconsistent to accept a fetus as a "person" for the purposes of the wrongful death statute when the Hawai'i Supreme Court held in *State v. Aiwohi*, 109 Hawai'i 115, 123 P.3d 1210 (2005), that a fetus is not a "person" as defined in the Hawai'i Penal Code. In *Aiwohi*, the defendant admitted to using crystal methamphetamine while she was pregnant. *Id.* at 117, 123 P.3d at 1212. Her child was born alive, but died two days later. *Id.* at 115–16, 123 P.3d at 1210–11. An autopsy revealed that the death was caused by methamphetamine. *Id.* The defendant was charged and convicted with the crime of manslaughter as defined in HRS § 707–702(1)(a) (1993). *Id.* at 117, 123 P.3d at 1212. The supreme court concluded that to be guilty of manslaughter, the defendant's conduct must have been directed against a "person". *Id.* at 128, 123 P.3d at 1223. HRS

---

existence if removed from its mother's womb, and it has often been noted that a fetus ordinarily becomes viable during the sixth or seventh month of its mother's pregnancy.

Sheldon R. Shapiro, Annotation, *Right to maintain action or to recover damages for death of unborn child*, 84 A.L.R.3d 411, at § 4(a) n. 72 (originally published in 1978, annotation updated weekly, last accessed on January 21, 2016).

8. The jurisdictions in which a cause of action was created by judicial decision are Alabama, Arizona, Arkansas, Connecticut, Delaware, the District of Columbia, Georgia, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Utah, Vermont, Washington, West Virginia, and Wisconsin. *See Eich v. Town of Gulf Shores*, 293 Ala. 95, 300 So.2d 354 (1974), *Summerfield v. Super. Ct.*, 144 Ariz. 467, 698 P.2d 712 (1985); *Aka v. Jefferson Hosp. Ass'n, Inc.*, 344 Ark. 627, 42 S.W.3d 508 (2001); *Hatala v. Markiewicz*, 26 Conn.Supp. 358, 224 A.2d 406 (Conn.Super.Ct.1966); *Worgan v. Greggo & Ferrara, Inc.*, 128 A.2d 557 (Del.Super.Ct.1956); *Greater Southeast Cmty. Hosp. v. Williams*, 482 A.2d 394 (D.C.1984); *Porter v. Lassiter*, 91 Ga.App. 712, 87 S.E.2d 100 (1955); *Volk v. Baldazo*, 103 Idaho 570, 651 P.2d 11 (1982); *Chrisafogeorgis v. Brandenberg*, 55 Ill.2d 368, 304 N.E.2d 88 (1973); *superseded by statute*, 740 Ill. Comp. Stat. 180/2.2 (Westlaw 2015); *Hale v. Manion*, 189 Kan. 143, 368 P.2d 1 (1962); *Mitchell v. Couch*, 285 S.W.2d 901 (Ky.1955); *Danos v. St. Pierre*, 402 So.2d 633 (La.1981); *Brown v. Contemporary OB/GYN Assocs.*, 143 Md. App. 199, 794 A.2d 669 (2002); *Mone v. Greyhound Lines, Inc.*, 368 Mass. 354, 331 N.E.2d 916 (1975); *O'Neill v. Morse*, 385 Mich. 130, 188 N.W.2d 785 (1971); *Verkennes v. Corniea*, 229 Minn. 365, 38 N.W.2d 838 (1949); *Rainey v. Horn*, 221 Miss. 269, 72 So.2d 434 (1954); *Connor v. Monkem Co., Inc.*, 898 S.W.2d 89 (Mo. 1995); *Strzelczyk v. Jett*, 264 Mont. 153, 870 P.2d 730 (1994); *White v. Yup*, 85 Nev. 527, 458 P.2d 617 (1969); *Poliquin v. Macdonald*, 101 N.H.

104, 135 A.2d 249 (1957); *Salazar v. St. Vincent Hosp.*, 95 N.M. 150, 619 P.2d 826 (N.M.Ct.App. 1980); *DiDonato v. Wortman*, 320 N.C. 423, 358 S.E.2d 489 (1987); *Hopkins v. McBane*, 359 N.W.2d 862 (N.D.1984); *Werling v. Sandy*, 17 Ohio St.3d 45, 476 N.E.2d 1053 (1985); *Evans v. Olson*, 550 P.2d 924 (Okla.1976); *Libbee v. Permanente Clinic*, 268 Or. 258, 518 P.2d 636 (1974); *Amadio v. Levin*, 509 Pa. 199, 501 A.2d 1085 (1985); *Presley v. Newport Hosp.*, 117 R.I. 177, 365 A.2d 748 (1976); *Fowler v. Woodward*, 244 S.C. 608, 138 S.E.2d 42 (1964); *Carranza v. U.S.*, 267 P.3d 912 (Utah 2011) (plurality opinion); *Vaillancourt v. Med. Ctr. Hosp. of Vt.*, 139 Vt. 138, 425 A.2d 92 (1980); *Moen v. Hanson*, 85 Wash.2d 597, 537 P.2d 266 (1975); *Baldwin v. Butcher*, 155 W.Va. 431, 184 S.E.2d 428 (1971); *Kwaterski v. State Farm Mut. Auto. Ins. Co.*, 34 Wis.2d 14, 148 N.W.2d 107 (1967).

The states that now allow for a cause of action for the wrongful death of a fetus by statute include Alaska, Arkansas, Illinois, Indiana, Kansas, Louisiana, Michigan, Mississippi, Nebraska, Oklahoma, South Dakota, Tennessee, Texas, and Virginia. *See* Alaska Stat. Ann. § 09.55.585 (Westlaw 2015); Ark.Code Ann. § 16–62–102 (Westlaw 2015); 740 Ill. Comp. Stat. 180/2.2 (Westlaw 2015); Ind.Code Ann. § 34–23–2–1 (Westlaw 2015); Kan. Stat. Ann. § 60–1901 (Westlaw 2015); La. Civ.Code Ann. art. 26 (Westlaw 2015); Mich. Comp. Laws Ann. §§ 600.2922, 600.2922a (Westlaw 2015); Miss.Code Ann. § 11–7–13 (Westlaw 2015); Neb.Rev.Stat. § 30–809 (Westlaw 2015); 12 Okla. Stat. Ann. 12, § 1053 (Westlaw 2015); S.D. Codified Laws § 21–5–1 (Westlaw 2015); Tenn.Code Ann. § 20–5–106(d) (Westlaw 2015); Tex. Civ. Prac. & Rem. Code Ann. § 71.001 (Westlaw 2015); Va.Code Ann. § 8.01–50 (Westlaw 2015) (only natural mother or her estate can bring claim under wrongful death statute for the death of her fetus).

The states that have not yet decided this issue are Colorado, Hawai'i, and Wyoming. Federal courts, however, have interpreted the laws of Alaska, Colorado, and Hawai'i to permit such a cause of action. *See Espadero v. Feld*, 649 F.Supp. 1480 (D.Colo.1986); *Wade v. U.S.*, 745 F.Supp. 1573 (D.Haw.1990).

§ 707–700 (1993), which defines the terms used in Part I of the Hawai'i Penal Code, defines "person" as "a human being who has been born and is alive." As the court stated, "a fetus is clearly not one 'who has been born and is alive.'" *Aiwohi*, 109 Hawai'i at 129, 123 P.3d at 1224. Additionally, the court noted:

Even if, *arguendo*, the statutory language were perceived to be ambiguous, the term "person" may not be construed so as to include fetuses. Where statutory language is ambiguous, HRS § 1–15 (1993) directs this court to look to "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it...." HRS § 1–15. In the present case, there is nothing in the legislative history indicating that the legislature intended to include fetuses within the definition of the term "person." In the absence of clear statutory language, and with no legislative guidance vis-á-vis legislative history, the applicable doctrine is the rule of lenity. *See State v. Shimabukuro*, 100 Hawai'i 324, 327, 60 P.3d 274, 277 (2002) (stating that "[w]here a criminal statute is ambiguous, it is to be interpreted according to the rule of lenity"); *State v. Kaakimaka*, 84 Hawai'i 280, 292, 933 P.2d 617, 629 (1997) (stating that "[a]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity") (citations omitted). Consequently, even if the language were viewed

as ambiguous, the statute would still have to be strictly construed in favor of [defendant] and against the prosecution.

*Id.*

In *State v. Jardine*, 101 Hawai'i 3, 61 P.3d 514 (App.2002), the Intermediate Court of Appeals similarly declined to recognize an unborn child as a "person" or "another" for purposes of the choice of evils defense or the defense of "use of force for the protection of other persons", writing "[s]ince Hawai'i has not legislatively included unborn children within the definitions of 'another' or 'person' for purposes of the Hawai'i Penal code, we decline to do so." *Id.* at 9–10, 61 P.3d at 520–21 (footnote omitted).

The State contends that it would conflict with the statutory interpretation of the penal code to hold that a fetus can be a "person" for the purposes of the wrongful death statute. It also argues that "it would be inconsistent to allow a civil claim to be prosecuted against the State for the death of Appellee's fetus when Appellee could not be prosecuted for the harm she herself did to her fetus."

This argument is unconvincing. First, although not dispositive, we note that Hawai'i is one of only nine states that still apply the "born alive" rule and have not amended their criminal homicide statutes to include unborn children as victims.[9] Of those nine states, seven allow a cause of action for the wrongful

---

**9.** Besides Hawai'i, these states include Colorado, Connecticut, Delaware, New Hampshire, New Jersey, New Mexico, Oregon, and Vermont. *See* Colo.Rev.Stat. Ann. § 18–3–101 (Westlaw 2015); 11 Del.Code Ann. 11, § 222 (Westlaw 2015); Or.Rev.Stat. § 163.005 (Westlaw 2015); *State v. Courchesne*, 296 Conn. 622, 998 A.2d 1 (2010); *State v. Lamy*, 158 N.H. 511, 969 A.2d 451 (2009); *State ex rel. A.W.S.*, 182 N.J.Super. 278, 440 A.2d 1144 (N.J.Super.Ct.App.Div.1981); *State v. Willis*, 98 N.M. 771, 652 P.2d 1222 (N.M.Ct.App.1982); *State v. Oliver*, 151 Vt. 626, 563 A.2d 1002 (1989).

The remaining jurisdictions have either defined a "person" to include a fetus for purposes of homicide, *see, e.g.*, Ala.Code 1975 § 13A–6–1 (2004) (The term "person," when referring to the victim of a criminal homicide or assault, includes an unborn child at any stage of development); *Com. v. Cass*, 392 Mass. 799, 467 N.E.2d 1324 (1984) (rejecting the common law "born alive" rule and holding that viable fetuses can be victims of homicide); Tex. Penal Code Ann.

§ 1.07(a)(26) & (38) (Westlaw 2015) (in the penal code, a "person" is an individual, corporation, or association, and an "individual" includes an unborn child at every stage of gestation); have added statutes specifically making it a form of homicide to kill an unborn child in certain circumstances, *see, e.g.*, Ga.Code Ann. § 16–5–80 (Westlaw 2015) (defining the crimes of "feticide" and "voluntary manslaughter of an unborn child"); 18 Pa.Stat. Ann. §§ 2603–2605 (creating the offense of "Criminal homicide of unborn child"); R.I. Gen. Laws Ann. § 11–23–5 (Westlaw 2015) (the willful killing of an unborn quick child is manslaughter); S.C.Code Ann. § 16–3–1083 (Westlaw 2015) (creating the offense of "Death or injury of child in utero due to commission of violent crime"); or have not decided the issue. Specifically, the District of Columbia, Maine, and Wyoming do not have statutes defining a "person" as one who has been born alive and a review of the case law does not reveal whether they would consider a fetus to be a victim of homicide.

death of an unborn, viable fetus.[10] Only one, New Jersey, specifically bars such a cause of action, while another, Colorado, is undecided.[11] Thus, the existence of the "born alive" rule in a state's penal code clearly does not foreclose the existence of a cause of action for the wrongful death of a viable fetus.

Second, a review of the case law from other jurisdictions provides compelling justification for this coexistence. When presented with the argument that the existence of a cause of action for the death of an unborn fetus is inconsistent with the "born alive" rule, courts often rely on the well-established principle that, while civil causes of action are remedial in nature and therefore are generally construed liberally, criminal statutes are construed strictly and in favor of the accused. *See, e.g., State v. Amaro,* 448 A.2d 1257, 1258–60 (R.I.1982) (holding that a fetus is not a person under the vehicular homicide statute even though a fetus could be a person in a wrongful death cause of action and even though the legislature made it a crime to intentionally kill an unborn, quick child. The vehicular homicide statute is penal in nature and must be narrowly construed); *State v. Oliver,* 151 Vt. 626, 563 A.2d 1002, 1004 (1989) ("The wrongful death statute is remedial in nature, being designed to allay the harsh common law rule denying liability due to the death of the victim, and must therefore be construed liberally. Penal statutes, on the other hand, are to be strictly construed in a manner favorable to the accused.") (citations omitted); *State v. Dunn,* 82 Wash.App. 122, 916 P.2d 952, 955 (1996) ("Unlike the wrongful death statute, which is remedial in nature and interpreted liberally as a result, a criminal statute must be given a literal and strict interpretation. If a criminal statute is ambiguous ... the rule of lenity requires us to adopt an interpretation most favorable to the criminal defendant.") (citations omitted); *see also State v. Trudell,* 243 Kan. 29, 755 P.2d 511, 512 (1988) ("Whereas a tort statute may be construed liberally in order to give effect to its remedial purpose, a criminal statute, with its punitive effect, must be strictly construed against the

State and in favor of the accused."), *superseded by statute,* Kan. Stat. Ann. § 21–5419 (Westlaw 2015); *State v. Soto,* 378 N.W.2d 625, 630 (Minn.1985) ("It does not follow that because we held in *Verkennes* that next of kin might recover damages arising out of the destruction of a viable fetus in a civil action ..., that a viable fetus is a 'human being' for purposes of the criminal law."), *superseded by statute,* Minn.Stat. Ann. § 609.2665 (Westlaw 2015); *State ex rel. Atkinson v. Wilson,* 175 W.Va. 352, 332 S.E.2d 807, 810–12 (1984) (holding that the murder statute did not authorize prosecution for killing a viable unborn child, even though a wrongful death cause of action could exist, because the wrongful death act is a remedial statute which is construed liberally whereas the legislature, not the courts, have the primary power to create and define crimes and penalties), *superseded by statute,* W. Va.Code Ann. § 61–2–30 (Westlaw 2015). *But see Justus v. Atchison,* 19 Cal.3d 564, 139 Cal.Rptr. 97, 565 P.2d 122, 132 (1977) ("But we do not join those courts which have equated fetus with person simply because the wrongful death statute is 'remedial' and must be 'liberally' construed."); *Stern v. Miller,* 348 So.2d 303, 308 (Fla.1977) ("We recognize that the new Wrongful Death Act is remedial in nature and is to be construed liberally. However, we cannot construe the statutory provisions so 'liberally' as to reach a result contrary to the clear intent of the legislature.")

▮ Pursuant to Hawai'i precedent, remedial statutes are to be liberally interpreted. *Kalima v. State,* 111 Hawai'i 84, 100, 137 P.3d 990, 1006 (2006). "Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries." *Id.* (citations and internal quotation marks omitted). Inasmuch as "[t]he purpose of damages in wrongful death and survival statutes is compensation for loss, not punishment," and HRS § 663–3 creates a statutory right for non-dependent relatives to sue for wrongful death, a right which did not exist under common law, we conclude

---

**10.** These states are Connecticut, Delaware, New Hampshire, New Mexico, Oregon, Vermont, and Washington. *See supra* note 9.

**11.** *See supra* note 9.

that this statute is remedial in nature. *Greene v. Texeira,* 54 Haw. 231, 505 P.2d 1169, 1170 (1973) (as quoted); *see also Estate of Coates v. Pac. Eng'g, a Div. of Pac. Lining Co., Inc.,* 71 Haw. 358, 364, 791 P.2d 1257, 1260 (1990) (regarding the common law tort). By contrast, the statute in *Aiwohi,* which defined the word "person," was construed strictly and with lenience towards the defendant because it was a penal statute. *Aiwohi,* 109 Hawaiʻi at 129, 123 P.3d at 1224. Further, the penal code itself makes clear that its definitions are to apply to the chapter of the penal code relating to offenses against the person; there is nothing to indicate that it has any application to civil tort statutes. HRS § 707–700.

We also note that various Hawaiʻi statutes use different definitions of the word "person." *See, e.g.,* HRS § 431:1–212 (2005) (a person as defined in the insurance code includes companies, businesses, corporations, etc.); HRS § 554G–2 (Supp.2015) (a person as defined in the Permitted Transfers in Trust Act includes only natural persons), HRS § 651–91(1)(4) (1993) (as used in HRS §§ 651–92 to 651–96 (1993), a person means any individual under sixty-five years of age other than the head of a family). Thus, we reject the State's argument that it would be irreconcilably inconsistent to define a person differently under the wrongful death statute and the penal code.

■ Next, we find compelling reasons to include unborn, viable fetuses as persons under the wrongful death statute. We adopt the persuasive rationale of the Vermont Supreme Court, which wrote:

Numerous reasons have been assigned by the several jurisdictions for reaching the conclusion to which we subscribe. The ones commonly given, and in our view convincing, are summarized in *White v. Yup,* 85 Nev. 527, 536, 458 P.2d 617, 622 (1969) as follows:

A. If a child, injured when a viable fetus as a result of another's negligence, has a cause of action when born, then it can make no difference in liability whether death occurs just prior to or just after birth.

B. A viable unborn child is, in fact, biologically speaking, a presently existing person and a living human being, because it has reached such a state of development that it can presently live outside the female body, as well as within it.

C. If no right of action is allowed, there is a wrong inflicted for which there is no remedy. Where negligent acts produce a stillbirth and a right of action is denied, an incongruous result is produced. For example, if a doctor acted negligently while delivering a baby and it died, the doctor would be immune from lawsuit. However, if he badly injured the child, the doctor would be exposed to liability. Under such a rule, there is the absurd result that the greater the harm, the better the chance of immunity, and the tort-feasor could foreclose his own liability. (Citations omitted in each instance).

*Vaillancourt v. Med. Ctr. Hosp. of Vt., Inc.,* 139 Vt. 138, 425 A.2d 92, 94–95 (1980). *See also* 19 Am.Jur. Proof of Facts 3d 107 § 7 (2015) ("A reading of the opinions of the majority states makes clear that the reasons supporting the recognition of an action for the wrongful death of a viable unborn child center on the distinct, independent nature of the unborn at viability; a viable unborn child is a 'person' or 'individual.' Further, the majority jurisdictions clearly express the remedial nature and purposes of the wrongful death remedy, and the injustice in allowing a tortfeasor to escape liability by inflicting greater harm.")

■ In addition, in Hawaiʻi, a child who is subsequently born alive may recover damages for negligently inflicted prenatal injuries. *Omori v. Jowa Haw. Co., Ltd.,* 91 Hawaiʻi 157, 161–62, 981 P.2d 714, 718–19 (App.1999), *aff'd as modified,* 91 Hawaiʻi 146, 981 P.2d 703 (1999). Thus, as observed in *Vaillancourt,* it should make no difference to the tortfeasor's liability whether the injuries result in death just prior to or just after birth. Further, as the majority of courts considering the issue recognize, to allow a cause of action in a case where an unborn child is injured but survives, while foreclosing a cause of action where the unborn child dies before birth, would lead to the absurd

and illogical result that greater harm results in a better chance of immunity. *See Wade,* 745 F.Supp. at 1578–79, *Vaillancourt,* 425 A.2d at 94–95; *Baldwin v. Butcher,* 155 W.Va. 431, 184 S.E.2d 428, 435 (1971); *Kwaterski v. State Farm Mut. Auto. Ins. Co.,* 34 Wis.2d 14, 148 N.W.2d 107, 110 (1967). Construing the wrongful death statute to recognize a cause of action on behalf of an unborn viable fetus avoids this absurd result. Further, it advances the statute's remedial purpose without contradicting any legislative intent. *See Cieri v. Leticia Query Realty, Inc.,* 80 Hawai'i 54, 68–69, 905 P.2d 29, 43–44 (1995) (holding that real estate or residences would qualify as "personal investments" as the term was used in the antitrust statute where the statute was remedial in nature and there was nothing in the legislative history that evidenced an intent to preclude real estate or residences from the definition of an "investment"); *see also* Shapiro, *supra* note 7, at § 2(a) ("In the absence of legislative history expressly indicating otherwise, it appears reasonable to assume that when wrongful death statutes have been enacted, legislators have generally given no thought to whether deaths of unborn children were intended to be included or excluded, and it is thus inappropriate to regard the issue as simply one of legislative intent.") (footnote omitted).

We also agree with the United States District Court for the District of Hawai'i which wrote in *Wade v. U.S.*:

> The majority position, allowing a cause of action for the wrongful death of a viable fetus who could have sustained life outside the womb, represents the more logical and thoughtful holding.... This conclusion comports with principles of fairness and justice in light of the fact that a live-born child may sue for injuries suffered as a fetus. To deny a wrongful death action in the event that the injury kills the fetus makes little sense. Such a denial would only immunize the more severe tort and would allow the tortfeasor to eliminate his own liability by increasing rather than by mitigating the impact of his wrongs. To

avoid such an anomaly, [we] construe[ ] the Hawai'i wrongful death statute to allow parents of a stillborn viable fetus to sue for its wrongful death.

745 F.Supp. at 1579.

Thus, we hold that a claim may be brought pursuant to HRS § 663–3 for the death of a viable, unborn fetus.[12]

### B. Briandalynne's Viability

█ The Circuit Court found, in FOF 41, that "during the approximately three-week period in July 2007, of Plaintiff's vaginal bleeding and Plaintiff's reports to OCCC staff of such bleeding, the baby was viable." The State argues that even if a cause of action is recognized for the wrongful death of a viable fetus, there is no evidence in the present case that Briandalynne was viable. This argument is without merit.

As noted above, viability refers to the ability of the fetus to survive outside its mother's womb. *See supra,* note 7. Here, the State's expert witness, Dr. Hirata, agreed that Briandalynne was viable during the entire period of Castro's bleeding up until July 29, 2007, and could have been delivered alive. Additionally, Dr. Killeen reported that upon examination, Castro's placenta appeared to be that of a term or near-term pregnancy. Dr. Killeen approximated that Briandalynne's gestational age was between thirty-five to thirty-seven weeks. Dr. Hariton testified that, "[i]f you can get a woman to 34 weeks ... once they get to 34 weeks, I would be very happy. I would deliver them because the chances of the baby doing well in the nursery is good after 34 weeks." Earlier in his testimony, Dr. Hariton also indicated that a baby would be able to survive outside its mother's womb at thirty-three weeks of gestation. Thus, we conclude that there was substantial evidence to support the court's finding that Briandalynne was viable. Accordingly, we also conclude that the Circuit Court did not err by denying summary judgment on the claims brought on behalf of Briandalynne's estate for wrongful death.

---

12. We need not address whether a claim for relief can be granted on behalf of a non-viable fetus because, as discussed below, we do not

disturb the Circuit Court's finding that Briandalynne was viable at the time of her death.

### C. The State's Negligence

#### 1. Duty and Breach

The Circuit Court's FOFs regarding DPS and OCCC policies for the health care of segregated inmates include the following:

12. During the approximately one-month period, from the time Plaintiff returned to OCCC from FDC on June 29, 2007, until Plaintiff's transfer to WCCC on August 2, 2007, Plaintiff's custodial status was that of "Administrative Segregation" or "lockdown." Plaintiff, like other inmates who were placed on administrative segregation, was locked up 23 hours a day, in one of the three designated "lockdown" or "segregation" cells in OCCC Module 20 (where women inmates were housed), and Plaintiff was segregated from and prohibited from having any contact with the general population of women inmates in Module 20. Inmates in the lockdown or segregation cells, were only permitted to have contact with the Adult Corrections Officers (ACOs).

13. DPS Policy No. COR.10D.02, Policy 4.3(a), requires health care staff to "make daily unscheduled rounds of all segregation units," and explicitly mandates that, "Each inmate in the segregation unit shall be observed by the health care staff and questioned about health problems . . ."

14. OCCC Policy No. 7.10D.21, Policy 4.2, requires that "Inmates in segregation shall be seen daily by health care staff."

15. OCCC nurse supervisors Roberta Marks and Keith Wakabayashi testified that the OCCC nurses were not required to follow the health care policies and procedures for segregated inmates *supra* for female inmates, because these policies only applied to male inmates held in a separate, stand-alone segregation holding unit. The OCCC nurse supervisors did not consider the three isolation cells in the women's module, Module 20, as "segregation."

16. The conditions of Plaintiff's confinement adduced at trial *supra*, and as described in the actual July 13, 2007 "Administrative Segregation" Order (imposing the disciplinary segregation penalty to Plaintiff by the OCCC Warden), constituted "segregation" as that term is defined in OCCC's

Policy No. 7.10D.21, "Health Evaluations of Inmates in Segregation." This OCCC segregated inmate health policy, by its own language, referred and applied to both male and female inmates.

17. Because Plaintiff was held in such segregated status, the DPS and OCCC policies *supra*, requiring health care staff to conduct daily visits to observe and question segregated inmates about their health status, applied to Plaintiff. These mandatory daily health care status visits and inquiries, however, were not conducted for Plaintiff, during the relevant time period.

. . . .

28. During Plaintiff's entire stay at OCCC, Plaintiff was on segregation status, from July 2 to August 2, 2007, The pertinent DPS and OCCC Policies and Procedures for medical care for segregated inmates mentioned *supra*, were not followed, and no medical staffer ever checked on, or communicated with Plaintiff, about her bleeding complaints. Nor was Plaintiff ever brought to the OCCC Medical Unit for evaluation of her complaints.

29. Although DPS Policy *supra*, required completion of diagnostic testing and other specialty services in a timely manner, this policy was also not followed, where Ms. Yasunaga's orders for the ultrasound and OBGYN evaluation, remained unfulfilled for a month, and ultimately were never done.

(Footnotes omitted).

■ The State challenges FOFs 12, 15–17, 28, and 29, to the extent that the Circuit Court found that the State did not follow DPS and OCCC policies for medical care of segregated inmates with respect to Castro. Specifically, the State argues:

While OCCC has a policy that requires that inmates in segregation are to be seen daily by health care staff, the only evidence presented in this case was that this policy applies only to the men's segregation holding unit and not the lockdown cells in the modules. . . .

[FOF 17] is wrong as there is no evidence to support it. Both Wakabayashi and Marks testified that the segregation

policy does not apply to the lockdown cells; rather the policy applies to the segregation unit at OCCC. Appellee did not present any evidence to refute this evidence.

We reject the State's argument that the medical care policy applies only to the men's segregation holding unit. DPS Policy No. COR.10D.06: Sick Call, introduced as Plaintiff's Exhibit 12 and referenced in the FOFs above, does not specify that it pertains only to the men's unit, but states: "This policy and procedure applies to all branch facilities and their assigned personnel." OCCC Policy No. 7.10D.21: Health Evaluation of Inmates in Segregation, which was introduced as Plaintiff's Exhibit 10 and referenced in the FOFs quoted above, defines "Segregation" as "All forms of inmate segregation from the general population for various reasons such as administrative segregation, disciplinary segregation, protective custody, and pre-trial hearing." It also states that, "[i]f health care staff detect a serious deterioration of a health condition while the inmate is in a disciplinary or other segregation unit, **he/she** shall be removed until the condition is stabilized." (Emphasis added). The evidence adduced at trial indicates that when Castro returned to OCCC from the FDC, she was put in administrative segregation from at least July 6, 2007 to August 2, 2007, when she was transferred to WCCC. Castro testified that the segregation cell she was put in was also known as a lockdown cell. OCCC ACO Sonja Maʻae agreed that the terms "segregation" and "lockdown" were used interchangeably. OCCC ACO Venus Kakiva testified that the lockdown cells in the women's module were used for "disciplinary, LD, administration, segregation, suicide watch, ... or therapeutic lockdown." Thus, there was substantial evidence that the referenced DPS and OCCC policies applied to Castro while she was in "segregation" or "lockdown" at OCCC.

We acknowledge that Marks, the nurse manager at the OCCC, testified that the OCCC Policy No. 7.10D.21 applied only to the men's side of the facility because to her

knowledge, the women's side was never designated as a segregation area by the warden. Marks also said that the NCCHC (the National Commission on Corrections Health Care) had confirmed to her that the women's side was not a segregation unit. Wakabayashi, the clinical administrator at the OCCC, also testified that the sick call policy did not apply to the female module, agreeing with the following statement: "So because you call the three segregation or lockdown units in the women's module only as 'lockdown,' you do not apply any of the segregation health rules to the women's side; is that correct?"

Nonetheless, it is well-settled that

In cases of conflicting evidence, the credibility of the witnesses and the weight to be given their testimony are within the province of the trial court and, generally, will not be disturbed on appeal. It is not the function of appellate courts to second-guess the trier of fact where there is substantial evidence in the record to support its conclusion.

*Stanford Carr Dev. Corp. v. Unity House, Inc.*, 111 Hawaiʻi 286, 296–97, 141 P.3d 459, 469–70 (2006) (citations omitted, block quote format altered). Here, the decision to weigh the conflicting evidence in Castro's favor was within the province of the Circuit Court and its decision was supported by substantial evidence in the record. Thus, we will not disturb the court's findings in FOFs 12, 15–17, 28, and 29, that the aforementioned DPS and OCCC policies applied to Castro.

The State also argues that it "substantially complied with the [OCCC] policy as a nurse did see Appellee in her cell most of the days in July and Appellee was in the health unit three different times." The State suggests that Castro could have made complaints to the medication nurse, the staff in the medical unit, or the sick call nurse. However, the court's finding was not that the State did not "substantially comply" with the policy, but that "pertinent DPS and OCCC Policies and Procedures for medical care for segregated inmates ... **were not followed.**"[13] (Em-

---

13. Additionally, it does not appear that the State "substantially complied" with the pertinent policies. The nurse to whom the State refers appears to be the nurse who delivered Castro's medication while she was in lockdown. Castro's uncontroverted testimony was that the nurse did

phasis added.) Further, whether or not Castro had the opportunity to make complaints to medical staff is not dispositive of whether the State complied with the DPS and OCCC policies which stated that "[i]nmate[s] in segregation **shall** be seen **daily** by health care staff" and "[e]ach inmate in segregation **shall be checked by the sick call nurse** and documented in sick call log." (Emphasis added.)

For these reasons, we reject the State's arguments that FOFs 12, 15–17, 28, and 29 are clearly erroneous.

The State also challenges FOFs 23–25, 27, 31, and 41–47, insofar as they relate to the State's negligence. Although arguing that "Appellee's evidence to support these findings is not sufficient and was rebutted by the State," the State addresses only FOFs 23, 27, 31, and 41.

FOF 23 states: "Within several days of Plaintiff's July 2, 2007 pre-natal visit with Ms. Yasunaga, Plaintiff began experiencing vaginal bleeding. Plaintiff made four to five reports of her vaginal bleeding to various ACOs, including ACO Hattie Reis, ACO Wanda Nunes, and ACO Reyetta Ofilas." The State does not dispute that Castro reported her bleeding to Ofilas, but disputes the court's characterization of the reports to the other two ACOs. Without citing to the record, the State claims that "Nunes was clear that Appellee's complaint was that she was spotting." However, a review of Nunes's testimony clearly reveals that by "spotting" she meant bleeding from the vaginal area.[14] As to Reis, the State argues that

Reis's testimony was not credible because she had built a friendship with Castro, and apparently argues that because Reis did not know the dates of the complaints and did not log them, it would be error to find that such complaints were made. As stated above, it is well-settled that the credibility of the witnesses and the weight of the evidence is within the province of the trial court and such determinations are generally not disturbed on appeal. *Stanford Carr Dev. Corp.*, 111 Hawai'i at 296–97, 141 P.3d at 469–70. Further, the fact that Reis did not recall the dates of the complaints and did not log them would not render the court's finding erroneous, especially where Reis reported that Castro complained to her about bleeding three times and Castro also testified that she complained to Reis at least three times. Therefore, we reject the State's argument that FOF 23 is clearly erroneous.

The State also challenges FOF 27, which states: "Up until Plaintiff's transfer out of OCCC on August 2, 2007, Plaintiff did not receive any medical care for her four to five complaints of vaginal bleeding, and was never sent to the OCCC Medical Unit." The State argues that this finding is erroneous because Castro was in the medical unit three times in July. As stated above, Castro was in the medical unit at least three times in July because of mental health issues. In context, FOF 27 is a finding that Castro was never sent to the medical unit *in response to her vaginal bleeding complaints*. The State points to no evidence to the contrary. This finding is not clearly erroneous.

not even have to speak with her when delivering her medications. Further, the evidence indicates that a nurse only visited Castro to deliver medications from July 3–6, and 12–31, 2007. Castro's visits to the medical unit in July, which the State also referenced, were apparently for mental health issues and psychiatric medication, and not prenatal care. Further, the evidence adduced at trial was that a sick call nurse did not see the female inmates in lockdown every day, but would have to be notified by an ACO to see an inmate in a lockdown cell or sometimes, the sick call nurse would see the inmate "calling out" to the nurse. Thus, even if Castro was visited by a nurse who delivered medication most days in July and was in the medical unit three times, and possibly had the ability to "call out" to a sick call nurse, this would not appear to "substantially comply" with OCCC Policy No. 7.10D.21 which says "Inmates

in segregation shall be seen daily by health care staff," and "Each inmate in segregation shall be checked by the sick call nurse and documented in sick call log."

14. The State also avers that: "As to ACO Nunes, she testified that she does not know if she called medical or not." This appears to challenge FOF 24, which states: "All three ACOs informed the OCCC medical unit of Plaintiff's vaginal bleeding and requested medical attention, but no medical care was provided." However, Castro's testimony was that she received a reply from Nunes, which she understood to come from the medical unit. Thus, we decline to hold that FOF 24 was clearly erroneous as evidence supported the finding that Nunes reported Castro's complaint to medical personnel.

The State challenges FOF 31 to the extent that it finds that when Castro arrived at WCCC on August 2, 2007, her fetus was no longer kicking. We agree that the record does not reflect the date on which Castro stopped feeling kicking and, in fact, it appears that the date was later than August 2, 2007.[15] However, the State has not explained how this error would affect its substantial rights. "No judgment, order, or decree shall be reversed, amended, or modified for any error or defect, unless the court is of the opinion that it has injuriously affected the substantial rights of the appellant." HRS § 641–2 (Supp.2015). It is undisputed that the baby stopped moving after the bleeding episodes, that on August 10, 2007, Castro reported to Amberg that she had not felt any movement for three to four days, and that on August 11, 2007, Briandalynne was stillborn. As it does not appear that the court's erroneous finding that the baby stopped moving as of August 2, 2007, as opposed to days later, would substantially affect the State's rights or the court's judgment, we decline to vacate the Circuit Court's decision based on this erroneous finding. "Erroneous findings of fact that are unnecessary to support the decision and judgment of the trial court are not grounds for reversal." *Wright v. Wright,* 1 Haw.App. 581, 585, 623 P.2d 97, 100 (1981) (citation omitted).

Finally, the State challenges FOF 41, which finds: "[D]uring the approximately three-week period in July 2007, of Plaintiff's vaginal bleeding and Plaintiff's reports to OCCC staff of such bleeding, the baby was viable." The finding that Castro was bleeding for approximately three weeks is supported by her testimony that she began bleeding within the first week or two of July, and then stopped right before she was transferred to the WCCC, which was August 2, 2007. And, as we noted above, the finding regarding viability was supported by substantial evidence, including the State's own expert, Dr. Hirata, who agreed that "during the entire period of Miss Castro's bleeding,

and up until July 29th, the baby was viable[.]"

The State makes no argument as to how the remaining challenged FOFs are clearly erroneous.

Thus, we cannot conclude that the Circuit Court erred in finding that the State breached its duty to Castro.

### 2. Causation

The Hawai'i Supreme Court has long held, in the context of negligence actions:

> The best definition and the most workable test of proximate or legal cause so far suggested seems to be this: "The actor's negligent conduct is a legal cause of harm to another if (a) his [or her] conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his [or her] negligence has resulted in the harm." *Restatement, Torts,* § 431; *Prosser on Torts.* § 47.

*Mitchell v. Branch,* 45 Haw. 128, 132, 363 P.2d 969, 973 (1961); *see also Aga v. Hundahl,* 78 Hawai'i 230, 236, 891 P.2d 1022, 1028 (1995) (quoting the *Mitchell* test with approval). Under the *Mitchell* test, a

> defendant's negligence need not have <u>been the whole cause</u> or the only factor in bringing about the harm. <u>It was enough that his [or her] negligence was a substantial factor in causing plaintiff's injuries.</u>

*Knodle* [*v. Waikiki Gateway Hotel, Inc.*], 69 Haw. [376] at 390, 742 P.2d [377] at 386 [ (1987) ] (citation, internal quotation marks, and brackets omitted) (emphases added).

As this court explained in *McKenna v. Volkswagenwerk Aktiengesellschaft,* 57 Haw. 460, 558 P.2d 1018 (1977):

> Th[e *Mitchell* ] test represents a realistic approach to problems of causation, an area which has long been complicated by a failure to distinguish between ques-

---

**15.** Castro's testimony appeared to indicate that the kicking stopped a few days after she arrived at WCCC.

tions of fact and policy concerns. The first arm of the test contemplates a factual determination that the negligence of the defendant was more likely than not a substantial factor in bringing about the result complained of. *See Prosser on Torts* § 41 (4th ed. 1971)....

The second arm of the *Mitchell* test contemplates inquiry whether there are policy concerns or rules of law that would prevent imposition of liability on the negligent party although his negligence was clearly a cause of the resultant injury....

*Id.* at 464–65, 558 P.2d at 1022 (emphases added). Moreover, "[w]here there is conflicting evidence, as there is in this record, on the issue of proximate causation, the question is one for the trier of fact." *Mitchell*, 45 Haw. at 139, 363 P.2d at 977 (citations omitted).

*Taylor–Rice v. State*, 91 Hawai'i 60, 74–75, 979 P.2d 1086, 1100–01 (1999).

■ In the present case, the State argues that the alleged lack of medical care was not a substantial factor in bringing about Briandalynne's death and challenges the Circuit Court's findings, in FOFs 48–50, that the State's negligence was the legal cause of her death. These FOFs state:

48. Had Plaintiff's medical care been consistent with the applicable standard of care, Plaintiff's bleeding condition would have been detected and treated; or if the bleeding condition could not have been corrected, delivery would have been initiated and Plaintiff's baby would have been born alive.

49. Given the undisputed earliest date of death of July 29, 2007 from Dr. Killeen, Plaintiff's baby could have been delivered alive, on or before that date. Had medical care for Plaintiff and her baby been provided consistent with the applicable standard of care after July 2, 2007 and before July 29, 2007, delivery of a live baby would have been accomplished.

50. Therefore, Defendant State's negligence was the legal cause of the death of Plaintiff's baby, and Plaintiff's injuries and damages.

In large part, the State argues that the court erred by affording greater weight to the opinions of Dr. Killeen and Dr. Hariton, rather than that of Dr. Hirata. We again decline to disturb the Circuit Court's determinations as to the credibility of these witnesses and weight of the evidence. *See Stanford Carr Dev. Corp.*, 111 Hawai'i at 296–97, 141 P.3d at 469–70. Here, we find substantial evidence to support the court's FOFs.

Dr. Hariton was qualified as an expert in obstetrics and gynecology. His opinion was that Castro's prenatal care was "totally inadequate and below the standard of care." He opined that if the tests and ultrasound that were ordered for Castro on July 2nd had been completed, "Ms. Castro would have been treated as a high risk pregnancy and would have a successful delivery." He testified that, "within a reasonable degree of probability," the cause of death was placental insufficiency and the cause of the insufficiency was placental separation. He also agreed that "[i]f the medical unit [at OCCC] had responded to at least one of the complaints of bleeding that came from them through the guard, ... this baby could have been saved."

Dr. Killeen was qualified as an expert in pathology and he performed Briandalynne's autopsy. Although he could not find a specific cause of death, he testified that "the more likely situation is that that death was related to an abruption." Dr. Killeen testified that "it was most likely that the fetus had been dead at least 96 hours, very likely one week but very likely less than two weeks at the time from fetal death to delivery." One week prior to delivery would have been August 4, 2007, while two weeks prior would have been July 29, 2007. Additionally, although he was called as the State's expert, Dr. Hirata agreed that up until July 29th, the baby was viable and could have delivered alive.

The State also argues that the alleged lack of medical care cannot be a substantial factor in this case "because the cause of the death of the fetus is not known." However, the State cites to no authority in support of its argument that the cause of death must be certain to prove that a party's negligence was

a "substantial factor" in bringing it about. In fact, in *Kaho'ohanohano v. Dept. of Human Servs.*, 117 Hawai'i 262, 306, 178 P.3d 538, 582 (2008), the supreme court upheld a finding that the State Department of Human Services's (**DHS's**) actions were the proximate cause of a minor's injury even though the perpetrator who injured the minor was never identified. Although the perpetrator was unknown, "the trial court stated, 'had DHS taken custody away from [Minor's mother], required supervised visits, or had a more strict service agreement, it is highly likely Minor would not have been injured.'" *Id.* (brackets omitted). The supreme court held that the "the trial court correctly concluded that DHS's conduct legally caused [Minor's injuries]." *Id.* Similarly, here, the court made sufficient findings to support its conclusion that the State legally caused Briandalynne's death. It found that, had the State observed the applicable standards of care, Briandalynne would have been born alive. The Circuit Court's findings were supported by substantial evidence.

■ In addition, the court made a finding regarding the cause of Briandalynne's death. FOF 37 states, in part: "Dr. Killeen's autopsy findings and conclusions indicated, *inter alia*, ... the cause of Baby Castro's death appeared to be related to 'intrauterine events occurring at the time of vaginal bleeding', and that, more likely than not, death was related to a placental abruption." In proving legal causation, "the plaintiff may solicit opinions from medical experts, but such medical opinions 'must be grounded upon a reasonable medical probability as opposed to a mere possibility because possibilities are endless in the field of medicine.'" *Miyamoto v. Lum*, 104 Hawai'i 1, 15–16, 84 P.3d 509, 523–24 (2004) (quoting *Craft v. Peebles*, 78 Hawai'i 287, 305, 893 P.2d 138, 156 (1995)). In this case, Dr. Killeen's opinion was that an abruption was the most likely cause of death, meaning "at least a 51 percent chance that this is the cause of death," while Dr. Hariton agreed that "within a reasonable degree of probability," placental insufficiency caused by a placental separation was the cause of death. Thus, the court's finding is not clearly erroneous and is based on reasonable medical probability as opposed to a mere possibility.

Finally, the State contests the court's finding of causation because "Dr. Hirata provided the most likely explanation for the cause of fetal death and, contrary to Appellee's expert witnesses, Dr. Hirata substantiated his opinions with substantive medical reasoning." Again, we refuse to second-guess the trial court's determinations regarding witness credibility and weight. We find no evidence that Drs. Killeen and Hariton, who were qualified as experts in their respective fields, did not base their opinions on substantive medical reasoning. Further, it was not improper for the trial court to reject Dr. Hirata's opinion that the cause of death was not an abruption, but the result of a consanguineous pregnancy. Dr. Hirata did not examine Briandalynne's body or the placenta, but rather, ruled out a placental abruption because the delivering obstetrician's notes did not mention an observed abruption, placental hemorrhage, or hematoma, and Dr. Killeen's notes did not mention "histologic evidence" of an abruption. However, Dr. Killeen, who performed an autopsy on Briandalynne and examined the placenta, testified that a blood clot was not required to diagnose an abruption, that a blood clot would not necessarily prove that an abruption occurred, and it was possible to have an abruption with "no features whatsoever in the resulting placenta." Additionally, Dr. Killeen stated, after looking at statistics on fetal morbidity in consanguineous pregnancies, "my conclusion was that that was a complete non-factor in the death of the fetus," and Dr. Hariton stated that "there's no medical evidence [that the death could be because of incest] anywhere. I've not only reviewed the literature, I've gone to medical libraries, I've gone to perinatologists, gone to colleagues, and nobody's ever heard of a stillbirth related to incest."

For these reasons, we refuse to set aside the Circuit Court's challenged causation findings as clearly erroneous.

### 3. Damages

■ While the persons enumerated in HRS § 663–3(b) [16] may recover damages for,

among other things, loss of love and affection, under HRS § 663-3(a), "the legal representative may recover on behalf of the estate the reasonable expenses of the deceased's last illness and burial." In addition, under HRS § 663-7 (1993):

> A cause of action arising out of a wrongful act ... shall not be extinguished by reason of the death of the injured person. The cause of action shall survive in favor of the legal representative of the person and any damages shall form part of the estate of the deceased.

**16.** These persons include "the surviving spouse, reciprocal beneficiary, children, father, mother, and ... any person wholly or partly dependent upon the deceased person." HRS § 663-3(b).

**17.** We note that not all states have distinct wrongful death statutes and survival of claims statutes. States typically provide separate remedies, like Hawai'i, or a single wrongful death cause of action that has varying availability of pecuniary losses and/or personal injury damages. For example, the State of Washington allows for two causes of action: (1) a wrongful death suit by the surviving relatives, and (2) a survival of personal injury claim by the estate of the decedent. *See Cavazos v. Franklin*, 73 Wash.App. 116, 867 P.2d 674, 677 (1994). However, in Virginia, a personal injury claim can survive the death of the injured person so long as the injury is unrelated to the cause of death; however, if the person's death was caused by the tortious personal injuries, then his or her estate is foreclosed from bringing a survival action and is limited to only the remedies provided in a wrongful death action. *See Campbell v. Harmon*, 271 Va. 590, 628 S.E.2d 308, 312 (2006). Similarly, New Hampshire also only provides one cause of action arising out of a wrongful death; it provides relief for both the surviving relatives and for the estate of the decedent. *See* N.H.Rev. Stat. Ann. §§ 556:7 & 556:9–14 (Westlaw 2015).

The varying forms of statutes, varying degrees of remedies, and evolving jurisprudence, make generalizations about the application of survival-of-claim statutes to claims on behalf of the deceased, but viable, unborn fetus much more complicated. However, at this time, it appears that **seventeen** states plus the District of Colombia recognize at least some sort of personal injury claims that survive the death of the viable, unborn fetus, **nineteen** (not including Hawai'i) have not decided the issue, and **thirteen** have affirmatively held that personal injury claims do not survive the death of the unborn fetus (with **six** of these **thirteen** states being jurisdictions which do not recognize wrongful death claims arising out of the death of a viable, unborn fetus). Put another way, of the **forty-two** jurisdictions that

As we have previously held, the estate of a deceased person may recover damages for the deceased's loss of enjoyment of life under HRS § 663-7 where the tortfeasor's negligent conduct contributed to the death. *Ozaki v. Ass'n of Apartment Owners of Discovery Bay*, 87 Hawai'i 273, 288–89, 954 P.2d 652, 667–68 (App.1998), *aff'd in part and rev'd in part on other grounds*, 87 Hawai'i 265, 954 P.2d 644 (1998). "[I]t is generally accepted that 'unless the survival statute limits damages, the recovery is the same one the decedent would have been entitled to at death.'" *Id.* (citation and brackets omitted).[17]

have recognized wrongful death claims stemming from the death of viable fetuses, it appears that **eighteen** also recognize potential for the survival of some claims of the viable, unborn child, **seventeen** have no precedent concerning the survival of an unborn child's claims, and **seven** have rejected allowing the survival of claims of the viable, unborn fetus.

More specifically, the District of Columbia and **four** states, Pennsylvania, South Carolina, Texas, and Washington, have recognized separate and distinct remedies for both wrongful death and survival actions for viable, unborn fetuses. *See Greater Se. Cmty. Hosp. v. Williams*, 482 A.2d 394, 398 (D.C.1984); *Amadio v. Levin*, 509 Pa. 199, 501 A.2d 1085, 1089 (1985); *Fowler v. Woodward*, 244 S.C. 608, 138 S.E.2d 42, 44 (1964); Tex. Civ. Prac. & Rem.Code Ann. §§ 71.001, 71.002, 71.021 (Westlaw 2015) & *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 98 (Tex.2004) (but may not apply to claims against health care providers); and *Cavazos*, 867 P.2d at 677.

The following **nineteen** states appear to recognize a viable, unborn fetus under a single cause of action related to wrongful death: Connecticut, Indiana, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Virginia, and West Virginia. Thirteen of these states appear to recognize some form of recovery for personal injury sustained by a viable, unborn fetus. Notably, **four** of these states' wrongful death laws only provide for pecuniary losses to survivors and do not provide recovery for the personal injuries of a decedent, born or unborn, and **two** of these states' wrongful death laws only provide recovery for death of unborn fetus to the fetus' natural mother. *See* Conn. Gen.Stat. Ann. § 52–555 (Westlaw 2015) & *Hatala v. Markiewicz*, 26 Conn.Supp. 358, 224 A.2d 406, 408 (Conn.Super.Ct.1966); Ind.Code Ann. § 34–23–2–1 (Westlaw 2015); Mass. Gen. Laws Ann. ch. 229, §§ 1, 2, 6 (2015) & *Mone v. Greyhound Lines, Inc.*, 368 Mass. 354, 331 N.E.2d 916, 920 (1975); *O'Neill v. Morse*, 385 Mich. 130, 188 N.W.2d 785, 788 (1971) & *Robertson v. Dev-*

Here, Briandalynne's estate was awarded $250,000 in damages for the loss of enjoyment of life. However, her First Amended Complaint made no mention of HRS § 663–7. Thus, the State argues that "[b]ecause Appellee has not pursued a claim under § 663–7, and has not moved to amend her claim, she is foreclosed from being awarded damages under that statute. Appellee is limited to the damages allowed in HRS § 663–3 only." We disagree.

■ While Castro did not reference HRS § 663–7 in her complaint, a plaintiff's failure to cite the statutory basis for her claim does not automatically render the complaint defec-

tive or insufficient. *Hall v. Kim*, 53 Haw. 215, 219–20, 491 P.2d 541, 544–45 (1971). The supreme court has held:

> Hawai'i's rules of notice pleading require that a complaint set forth a short and plain statement of the claim that provides defendant with fair notice of what the plaintiff's claim is and the grounds upon which the claim rests. [Hawai'i Rules of Civil Procedure (HRCP) ] Rule 8(a) (1999); *Au v. Au*, 63 Haw. 210, 220, 626 P.2d 173, 181 *(per curiam)*, *reconsideration denied*, 63 Haw. 263, 626 P.2d 173 (1981). Pleadings must be construed liberally. *Id.* General allegations of damages to be proven at trial are

*ereaux*, 32 Mich.App. 85, 188 N.W.2d 209, 213 n. 9 (1971); Minn.Stat. Ann. § 573.02 (Westlaw 2015) & *Verkennes v. Corniea*, 229 Minn. 365, 38 N.W.2d 838, 841 (1949); *Rainey v. Horn*, 221 Miss. 269, 72 So.2d 434, 440 (1954) & *In re Estate of England*, 846 So.2d 1060, 1068 (Miss. Ct.App.2003); Mo. Ann. Stat. §§ 537.080, 537.090 (2015) & *Connor v. Monkem Co., Inc.*, 898 S.W.2d 89, 92 (Mo.1995); Neb.Rev.Stat. Ann. §§ 30–809, 30–810 (Westlaw 2015); Nev. Rev.Stat. Ann. § 41.085 (Westlaw 2015) & *White v. Yup*, 85 Nev. 527, 458 P.2d 617, 623 (1969); N.H.Rev.Stat. Ann. §§ 556:7, 556:9–14 (Westlaw 2015) & *Poliquin v. MacDonald*, 101 N.H. 104, 135 A.2d 249, 251 (1957); *Estate of Krahmer ex rel. Peck v. Laurel Healthcare Providers, LLC*, 315 P.3d 298, 301–02 (N.M.Ct.App.2013) & *Salazar v. St. Vincent Hosp.*, 95 N.M. 150, 619 P.2d 826, 829 (N.M.Ct.App.1980); N.C. Gen.Stat. Ann, § 28A–18–2 (Westlaw 2015) & *DiDonato v. Wortman*, 320 N.C. 423, 358 S.E.2d 489, 494 (1987); 12 Okla. Stat. Ann. § 1053 (Westlaw 2015); Or. Rev.Stat. Ann. § 30.020 (Westlaw 2015) & *Libbee v. Permanente Clinic*, 268 Or. 258, 518 P.2d 636, 637 (1974); *Presley v. Newport Hosp.*, 117 R.I. 177, 365 A.2d 748, 754 (1976); S.D. Codified Laws § 21–5–1 (Westlaw 2015); Tenn.Code Ann. §§ 20–5–106, 20–5–113 (Westlaw 2015); Va. Code Ann. §§ 8.01–50, 32.1–249 (Westlaw 2015) & *Campbell v. Harmon*, 271 Va. 590, 628 S.E.2d 308, 312 (2006); and W. Va.Code Ann. § 55–7–8 (Westlaw 2015) & *Baldwin v. Butcher*, 155 W.Va. 431, 184 S.E.2d 428, 436 (1971) & *Farley v. Sartin*, 195 W.Va. 671, 466 S.E.2d 522 (1995) (also recognizing cause of action for nonviable fetus).

To date, the following **eighteen** states appear to recognize only wrongful death actions for viable, unborn fetuses, and have not extended recovery for a separate and distinct survival of personal injury claim: Alabama, Alaska, Arizona, Arkansas, Delaware, Georgia, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maryland, Montana, North Dakota, Ohio, Utah, Vermont, and Wisconsin. Notably, only one of these states, Louisiana, has categorically held that personal injury claims do not survive the death of a viable, unborn fetus.

The other **seventeen** states appear to have ruled only on the validity of a wrongful death action for an unborn fetus. *See Mack v. Carmack*, 79 So.3d 597, 611 (Ala.2011); Alaska Stat. Ann. § 09.55.585 (Westlaw 2015); *Summerfield v. Sup. Ct.*, 144 Ariz. 467, 698 P.2d 712, 724 (1985); Ark.Code Ann. §§ 16–62–101, 16–62–102 (Westlaw 2015); 10 Del.Code Ann. 10, §§ 3722, 3724, 3701 (Westlaw 2015) & *Worgan v. Greggo & Ferrara, Inc.*, 128 A.2d 557, 557–58 (Del.Super.Ct.1956); Ga.Code Ann. §§ 9–2–41, 19–7–1 (Westlaw 2015) & *Porter v. Lassiter*, 91 Ga.App. 712, 87 S.E.2d 100, 103 (1955); *Volk v. Baldazo*, 103 Idaho 570, 651 P.2d 11, 14–15 (1982); 740 Ill. Comp. Stat. Ann. 180/2.2 755 Ill. Comp. Stat. Ann. 5/27–6 (West 2015); Kan. Stat. Ann. §§ 60–1801, 60–1901, 60–1902 (Westlaw 2015); Ky. Rev.Stat. Ann. §§ 411.130, 411.133 (Westlaw 2015) & *Rice v. Rizk*, 453 S.W.2d 732, 735 (Ky. 1970); *Danos v. St. Pierre*, 402 So.2d 633, 639 (La.1981) & *Long v. Tangipahoa Hosp. Srv. Dist. No. 1*, 36 So.3d 366, 367–68 (La.Ct.App.2010); *Smith v. Borello*, 370 Md. 227, 804 A.2d 1151, 1155 (Ct.App.Md.2002) & *Brown v. Contemporary OB/GYN Associates*, 143 Md.App. 199, 794 A.2d 669, 701 (2002); Mont.Code Ann. §§ 27–1–501, 27–1–513 (Westlaw 2015) & *Strzelczyk v. Jett*, 264 Mont. 153, 870 P.2d 730, 733 (1994); *Hopkins v. McBane*, 359 N.W.2d 862, 865 (N.D.1984); *Werling v. Sandy*, 17 Ohio St.3d 45, 476 N.E.2d 1053, 1056 (1985); Utah Code Ann. §§ 78B–3–106, 78B–3–107 (Westlaw 2015) & *Carranza v. United States*, 267 P.3d 912, 915 (Utah 2011)(construing an earlier version of wrongful death statute); *Vaillancourt v. Med. Ctr. Hosp. of Vermont, Inc.*, 139 Vt. 138, 425 A.2d 92, 94 (1980); *Tesar v. Anderson*, 329 Wis.2d 240, 789 N.W.2d 351, 361 (Wis.Ct.App.2010).

As noted in section IV.A. *supra*, the following **six** states do not recognize any wrongful death or survival of claims actions for unborn fetuses: California, Florida, Iowa, Maine, New Jersey, and New York.

Only **two** other states, Colorado and Wyoming, have not yet determined whether any sort of wrongful death actions may be brought for an unborn fetus.

permissible and, in some instances, ad damnum clauses specifying the amount of damages are prohibited. *See, e.g.,* HRS § 663–1.3(a) (1993). *In re Genesys Data Techs., Inc.,* 95 Hawai'i 33, 41, 18 P.3d 895, 903 (2001) (footnote omitted).

 In the present case, despite failing to cite to HRS § 663–7, Castro did "set forth a short and plain statement of the claim" that provided the State with "fair notice of what the plaintiff's claim is and the grounds upon which the claim rests." *Id.* Castro's complaint made clear she was bringing a claim on behalf of Briandalynne's estate. Additionally, her complaint alleged that the defendants' negligence and/or gross negligence was a substantial factor in Briandalynne's death.[18] She prayed for general, compensatory, and special damages in an amount to be proven at trial. She did not specifically identify a claim for loss of enjoyment of life, but general damages include damages for the loss of enjoyment of life. *Dunbar v. Thompson,* 79 Hawai'i 306, 315, 901 P.2d 1285, 1294 (App.1995). Additionally, "general damages are those damages which usually accompany the kind of wrongdoing alleged in the complaint so that the mere allegation of the wrong gives sufficient notice to the opposite party of the kind of damage that will be claimed at trial[.]" *Ellis v. Crockett,* 51 Haw. 45, 50–51, 451 P.2d 814, 819 (1969). Further, Castro did not limit her request to special damages for the costs of Briandalynne's last illness and burial.

In sum, a liberal reading of Castro's complaint would put the State on notice that (1) she was bringing forth a claim on behalf of Briandalynne's estate, (2) the claim arose out of the State's negligence resulting in Briandalynne's death, and (3) she would be pursuing general damages in an amount to be proven at trial, which could include damages for the loss of enjoyment of life. Thus, the complaint reasonably informed the State of what Castro's claims were, their basis, and what the State would have to defend against. For those reasons, it was not insufficient.

*See Hall,* 53 Haw. at 215, 491 P.2d at 542 ("A complaint may state a claim upon which relief can be granted even though it does not specifically name the statutory provision, rule, or regulation upon which the claim is based; it is sufficient that the complaint give notice of the transaction upon which the claim is based upon which relief can be granted."); *see also Morales–Vallellanes v. Potter,* 339 F.3d 9, 14–15 (1st Cir.2003) (even though the complaint did not set forth the statutory basis for its claims, the court broadly construed it as alleging a cause of action under two possible remedial schemes). Accordingly, we conclude that Briandalynne's estate was not limited to damages for the costs of her last illness and burial. *See* HRCP Rule 54(c) ("Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.")

 The State also argues that, even if Briandalynne's estate is entitled to a damage award, there is insufficient evidence to support the court's award of $250,000 for her loss of enjoyment of life. Specifically, the State challenges FOF 56 which found: "The evidence established that the baby was normal, with no congenital or development abnormalities. Despite the incarcerated status of her mother, Baby Castro's life and her loss of enjoyment of life, are of the nature and kind of any other infant." The State's challenge is based on the testimony of Dr. Hirata:

> Dr. Hirata testified that there could be genetic disorders that cannot be physically seen and that could only be detected by genetic testing. The chances of this fetus hav[ing] genetic disorders is high, as Dr. Hirata testified, particularly because of the close relationship of the parents of the fetus. Thus, it is purely speculative to conclude that the fetus is normal. More-

---

18. Specifically, she alleged that:
The foregoing negligence and/or gross negligence of Defendants was and is a legal cause and/or substantial factor in causing the wrongful death of Plaintiff CASTRO's daughter,

BRIANDALYNNE CASTRO, and mental and emotional distress to Plaintiff relating to her daughter's death and such other and further injuries and effects and damages in such amount as shall be shown at the time of trial.

over, because the fetus died in utero, it [is] more likely than not that the fetus had a genetic defect.

Dr. Hirata testified that, in his opinion, the most likely cause of death was the consanguineous pregnancy, that offspring of a father-daughter mating are "often abnormal," and that the children of closely related parents have a high likelihood of inheriting deleterious mutations that could result in a genetic disorder. He also testified about a study that found that thirty-two percent of the offspring of first degree relatives born alive "would have either passed away, or would have significant mortality and morbidity." From that study, Dr. Hirata assumed that there was probably "a higher loss rate before delivery than after birth."

However, Dr. Hirata had no evidence that Briandalynne would have been in the thirty-two percent of offspring who either died or had significant morbidity. He agreed that if she had made it to term and had been born alive, she was more likely to be one of the approximately two-thirds of such offspring who would be "healthy, normal human beings."

Further, Dr. Killeen testified that he could not find any "gross congenital anomalies" meaning "visually we could not see any malformations of any kind." Nor did he observe any congenital or developmental abnormalities of any kind. Although Dr. Hirata testified that some genetic disorders could only be found with specific genetic testing and that it appeared that no such testing was done in this case, there was no evidence that Briandalynne had any such disorder.

In sum, there was sufficient evidence to support the court's finding that "the baby was normal, with no congenital or development abnormalities." Thus, we conclude that FOF 56 is not clearly erroneous.

■ The State also challenges the award of $100,000 to Castro for loss of filial consortium and the award of $250,000 for emotional distress, arguing that:

This damage award is based on speculation and is not supported by the evidence. Appellee has been incarcerated most of the time since the stillbirth of the fetus. There is no question that Appellee would not have been able to live with the child had it survived. . . .

. . . .

Moreover, given Appellee's incarceration, there is no credible evidence that Appellee would have been able to develop any kind of relationship with her baby had the fetus survived.

However, the Circuit Court expressly indicated that, in assessing Castro's damages for loss of filial consortium, it considered Castro's incarcerated status, the uncertainty of her parole release date, and that her ability to live with and raise her child was uncertain.[19] Additionally, it was reasonable to conclude that Castro would have had some relationship with her daughter once she was released from jail, especially in light of the finding that she grew to want her baby.

■ With respect to the award for emotional distress, the State argues that there is no credible evidence that Castro suffered emotional distress and that any evidence is conflicting at best. Dr. Sheila Wendler (**Dr. Wendler**) a psychiatrist at the WCCC who had treated Castro and prescribed her medication on several occasions, testified that she never saw any signs that Castro was suffering from any emotional distress over the loss of her fetus. However, Castro testified that she only saw Dr. Wendler about nine or ten times over the course of three and a half years, that each visit was not longer than five minutes, and that she did not discuss the loss of her baby because she was uncomfortable with her and "didn't know how to express [her]self." The State also points to a form signed by Castro in which she indicated that she had not recently experienced a significant loss such as a death in the family. However, this form was signed approximately six months after the stillbirth, and does not necessarily, as the State argues, "contra-

---

19. The court noted, however, in FOF 62, that through a program called "Women's Way," women parolees could live with and raise their newborns and that Castro might be paroled in 2012.

dict[ ] her assertion of emotional distress resulting from the stillbirth."

In the moments after learning her baby was dead, Castro described herself as an emotional wreck. When she was transferred back to the WCCC from the hospital, she "was a mess at that time." Even though she had been treated for PTSD and anxiety before her pregnancy, Castro said her emotions intensified after the stillbirth. "I'll never forget that stage, that depression stage I went through right after I lost my baby. It's totally different from my normal I guess mood swings or depression stages." Castro testified that after taking classes, including a grief class, "I realized that I was like suffering a lot of—they call it like PTSD, anxieties, depression, hidden anger, isolation.... And I was stuffing a lot of my feelings." She said that even five years after the loss of her fetus, she was still sad.

In addition, other witnesses provided evidence that Castro had suffered emotional distress. Castro's former cellmate, Jennifer Kong–Guillermo (**Kong–Guillermo**) testified that Castro kept a picture of the baby displayed in their cell and would always talk about the baby, including how she wanted to raise it better than she had been raised and wished it had lived. Although the State challenges Kong–Guillermo's credibility, we will not pass upon the trial court's determinations of credibility.

Additionally, Plaintiff's Exhibit 160, an investigative report written by Sergeant Venus Kakiva (**Sgt. Kakiva**) in response to a disturbance Castro caused in OCCC on August 30, 2007 revealed that Castro was likely suffering from distress following the stillbirth. The report indicated that Castro was involved in a disturbance that began with her yelling at another inmate and ended with her being restrained by corrections officers. The report included interviews with various corrections officers and inmates who indicated that Castro had been emotional and angry

since the loss of her child.[20] Sgt. Kakiva reported that Castro

> began, to share her experience of anger and frustration and not knowing how to deal with her los[s].... I, Sgt. KAKVIA [sic] felt that FO–CASTRO's behavior is highly relevant to the los[s] of her child which was stillborn. It is evident that her mental state is at a vulnerable and emotional state.

Sgt. Kakiva recommended that Castro be treated for Post Traumatic Stress Disorder.

Thus, we conclude there was sufficient evidence that Castro suffered emotional distress as a result of Briandalynne's death. As the court's findings were not clearly erroneous, and we do not find its award of damages to be excessive, we will not disturb the Circuit Court's award of general damages. *Viveiros v. State*, 54 Haw. 611, 614, 513 P.2d 487, 489 (1973); *Lima v. Tomasa*, 42 Haw. 478, 482–83 (Haw.Terr.1958) ("[appellate courts] will not disturb the trial court respecting the amount of general damages unless the amount awarded is so excessive as to shock the moral sense").

### D. The State's Remaining Points of Error

In its conclusion, the State challenges two remaining FOFs, contending that they show the Circuit Court's decision was based on sympathy and not upon the evidence or law. First, the State challenges FOF 60 which reads:

> Despite this poor start to her pregnancy, Plaintiff grew to want the baby, when she experienced the baby's kicking. Plaintiff cooperated with her pre-natal care, took her pre-natal vitamins, and reported vaginal bleeding symptoms which were of concern to her. Plaintiff herself had not been raised by her parents, and had been in foster care since she was a year old. Plaintiff believed the baby would change

---

**20.** For example, the interviewees indicated that "it appeared that FO–CASTRO was still suffering from Post Pardon [sic] Syndrome due to the fact that FO–CASTRO just had experienced the los[s] of her unborn child that was stillbirth[,]" "Since FO–CASTRO's experience with loosing [sic] her unborn child, her behavior has been disruptive, emotional, and at times unexplainable.... I think it's really taking a toll on her right now [,]" and "FO–CASTRO is just acting out a lot anger because she lost her baby. It's like she's just going off because she feels that no one understands what she ... is going through."

her life for the better, and the baby represented an opportunity for Plaintiff to give and receive the unconditional love to a family member that Plaintiff herself had never experienced.

The State takes issue with the statement that Castro's bleeding was of concern to her. However, as discussed above, there is substantial evidence to support the finding that Castro made four or five reports of her bleeding to at least three ACOs. Further, according to Castro, the responses she received informed her that she would not be seen by the medical staff unless her pad became saturated. Thus, her failure to report her bleeding on other occasions can be explained by her reliance on the responses she got from the ACOs and not her lack of concern for her bleeding.

The State also challenges FOF 61 which states that:

> To Plaintiff, having this baby represented a rare opportunity for her to become a mother, for two reasons. First, the pregnancy was the result of Plaintiff being raped by her father, and was a situation that was unlikely to recur. Second, Plaintiff was a lesbian who did not expect to have an opportunity to conceive in the future. Plaintiff felt Baby Castro was her one chance to have a family of her own.

We agree that the evidence that Castro was raped is scant, but it is not, as the State contends, nonexistent. Dr. Wendler testified that Castro had expressed severe anger towards her father, saying he had raped her.

The State also argues that there was no evidence that Castro was a lesbian or that she believed Briandalynne was her "one chance to have a family of her own." Castro

did testify that she was homosexual. However, although there was evidence that she wanted to keep the baby, we are unable to find evidence in the record that Castro believed this was her one chance to have a family of her own.

Even assuming that these findings are erroneous, as discussed above, there was substantial evidence to support the court's award of damages. "Erroneous findings of fact that are unnecessary to support the decision and judgment of the trial court are not grounds for reversal." *Wright*, 1 Haw.App. at 585, 623 P.2d at 100. Further, the damages awarded were not so excessive as to indicate that the court was motivated by sympathy for Castro rather than the evidence or law. *Quedding v. Arisumi Bros., Inc.*, 66 Haw. 335, 339, 661 P.2d 706, 709 (1983) ("a finding of an amount of damages ... will not be disturbed on appellate review unless palpably not supported by the evidence, or so excessive and outrageous when considered with the circumstances of the case as to demonstrate that the [trial court] in assessing damages acted against rules of law or suffered [its] passions or prejudices to mislead [it]"). Accordingly, we decline to vacate or remand the court's decision based on these grounds.[21]

## V. CONCLUSION

For these reasons, the Circuit Court's July 31, 2012 Judgment is affirmed.

---

**21.** We note that although the State listed additional FOFs in its Points of Error on Appeal, it failed to address them in its arguments and thus, we deem the contention that these FOFs were clearly erroneous to be waived. Hawai'i Rules of Appellate Procedure Rule 28(b)(7).