**Electronically Filed**
**Supreme Court**
**SCWC-12-0000753**
**13-MAR-2018**
**08:22 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

---

LEAH CASTRO, individually and as PERSONAL REPRESENTATIVE
of the ESTATE OF BRIANDALYNNE CASTRO, deceased minor,
Respondent/Plaintiff-Appellee,

vs.

LEROY MELCHOR, in his official capacity; WANNA BHALANG,
in her official capacity; TOMI BRADLEY, in her official
capacity; STATE OF HAWAI'I; and HAWAI'I DEPARTMENT OF
PUBLIC SAFETY, Petitioners/Defendants-Appellants,

and

AMY YASUNAGA, in her official capacity; ROBERTA MARKS,
in her official capacity; KENNETH ZIENKIEWICZ, M.D., in
his official capacity; and KEITH WAKABAYASHI, in his
official capacity, Respondents/Defendants-Appellees.

---

SCWC-12-0000753

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-12-0000753; CIV. NO. 08-1-0901)

MARCH 13, 2018

RECKTENWALD, C.J AND WILSON, J., WITH
NAKAYAMA, J., CONCURRING SEPARATELY, AND
McKENNA, J., WRITING SEPARATELY, WITH WHOM POLLACK, J., JOINS

OPINION OF RECKTENWALD, C.J.

## I.  Introduction

This case arises from a complaint filed by Respondent Leah Castro (Castro), who had a stillbirth while she was incarcerated.  Castro brought suit against Leroy Melchor, Wanna Bhalang, Tomi Bradley (all in their official capacities), the State of Hawaiʻi, and the Hawaiʻi Department of Public Safety (HDPS) (together, "Petitioners") for negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress.  Castro asserted that Petitioners' failure to provide her with timely and adequate medical care led to the stillbirth of her child, Briandalynne.

After a bench trial, the Circuit Court of the First Circuit ruled in Castro's favor, awarding her $250,000 for negligent infliction of emotional distress and $100,000 for loss of filial consortium, and awarding $250,000 to Briandalynne's estate "for the loss of life itself and for all of the damages that [Briandalynne] would have been entitled to had she been alive, such as loss of enjoyment of life."  The Intermediate Court of Appeals (ICA) affirmed the circuit court's decision.  Castro v. Melchor, 137 Hawaiʻi 179, 366 P.3d 1058 (App. 2016).

2

Petitioners' application presents a question of first impression to this court:  whether the estate of a viable fetus can recover for loss of enjoyment of life, also known as "hedonic," damages.  We conclude that Briandalynne's estate could recover such damages against Petitioners, and that the record supports the amount of the damages awarded.  Accordingly, we affirm the ICA's judgment on appeal.

## II. Background

### A.  Factual Allegations and Circuit Court Proceedings

Castro filed a Complaint in her own capacity, and as personal representative of the Estate of Briandalyne, in circuit court on May 6, 2008, alleging assault and battery, negligence, and intentional and negligent infliction of emotional distress against the State of Hawai'i, the HDPS, and two correctional officers at O'ahu Community Correctional Center (OCCC) in their official capacities.

The Complaint alleged that on June 30, 2007, while Castro was an inmate at OCCC, she was forced to the ground, or "taken down," by correctional officers Debra Pimental and Ted Choy Foo.  Castro was approximately seven months pregnant at the time.  After the incident, Castro was transferred to the Women's Community Correctional Center (WCCC).  Castro developed problems with vaginal bleeding, which she reported to staff at both OCCC

3

and WCCC, but "was not provided with timely or adequate medical care."

Castro alleged that the actions of the correctional officers and the subsequent failure of medical personnel to provide her with treatment caused the stillbirth of her eight-month-old fetus, Briandalynne. Briandalynne was delivered stillborn on August 10, 2007, at the Kapi'olani Medical Center. Available medical records indicated that Briandalynne's death was caused by "significant fetal stress" and "hypoxia." Castro contended that the actions of correctional officers Pimental and Choy Foo constituted assault and battery upon her and her unborn fetus.

Castro also contended that Pimental, Choy Foo, the State, and HDPS were negligent because they "knew or should have known" that Castro was pregnant, and that they "breached their duty of reasonable care by failing to protect [Castro] and her unborn child from harm." Castro additionally asserted that the State and HDPS were liable for "negligent hiring, training, supervision, and retention" of the correctional officers who assaulted her. Furthermore, she asserted that Officers Pimental, Choy Foo, and other "responsible medical personnel" intentionally inflicted emotional distress on her, and that the State and HDPS negligently inflicted emotional distress on her as well.

4

Castro filed a First Amended Complaint on July 30, 2009, withdrawing her claims against the correctional officers. In addition to the State and HDPS, Castro added as defendants Leroy Melchor, Wanna Bhalang, Tomi Bradley, Amy Yasunaga, Roberta Marks, and Keith Wakabayashi, all of whom were nurses in the medical unit at OCCC, as well as Kenneth Zienkiewicz, a physician at the medical unit at OCCC. The individuals named in the First Amended Complaint were each sued in their official capacities. Castro raised claims of negligence against each of the defendants, and claims of intentional and negligent infliction of emotional distress against all defendants except the State and HDPS.

The defendants filed a motion for summary judgment, arguing, inter alia, that there is no legal authority allowing Castro to make a claim on behalf of the estate of a stillborn fetus. The defendants pointed to Hawai'i Revised Statutes (HRS) § 663-3 (Supp. 2009),[1] "[d]eath by wrongful act[,]" to argue that

---

[1]    HRS § 663-3 (Supp. 1997) ("Death by wrongful act") provides in pertinent part:

> (a) When the death of a person is caused by the wrongful act, neglect, or default of any person, the deceased's legal representative, or any of the persons enumerated in subsection (b), may maintain an action against the person causing the death or against the person responsible for the death. The action shall be maintained on behalf of the persons enumerated in subsection (b), except that the legal representative may recover on behalf of the estate the reasonable

(continued...)

"there must be injury to a person in order for a tort claim to lie." Defendants argued that Briandalynne was not a person, as contemplated by the statute; therefore, Castro could not make a claim on her behalf.

On May 13, 2011, the circuit court issued its order granting in part and denying in part the motion for summary judgment.[2] The court granted the motion "as to all claims against Defendants Yasunaga, Marks, Zienkiewicz[,] and Wakabayashi," as well as "to all claims brought by Plaintiff Leah Castro as Personal Representative of the Estate of Briandalynne Castro." The court denied the motion with respect to all other claims.

However, on October 14, 2011, the court issued an amended summary judgment order sua sponte, reversing its previous grant of summary judgment "with respect to all claims of Plaintiff Leah Castro as Personal Representative of the Estate of Briandalynne Castro." The court explained that its sua sponte decision was based upon its belief that its prior analysis was in error.[3]

---

[1](...continued)
   expenses of the deceased's last illness and burial.

[2]    The Honorable Rom A. Trader presided.

[3]    On October 24, 2011, this case was reassigned to Judge Karen T. Nakasone, as Judge Trader had been assigned to the criminal division.

A bench trial began on February 27, 2012. After the evidentiary portion of the trial was completed, Castro filed a memorandum regarding damages with the court. Castro explained that HRS § 663-3, the wrongful death statute, "governs recovery by the decedent's survivors[,]" and that HRS § 663-7,[4] the survival statute, "governs recovery for wrongful death by the estate of a decedent." Castro asserted that because "[t]he amount of recovery for the loss of life for the Estate of Briandalynne Castro is 'determined from the standpoint of the deceased,'" according to Rohlfing v. Moses Akiona, Ltd., 45 Haw. 373, 381-83, 369 P.2d 96, 101 (1961), "the value of the life and the loss of enjoyment of life of Briandalynne Castro are of the nature and kind as of any other child born in our community[,]" regardless of Castro's status as an incarcerated inmate. Castro stated that the Estate of Briandalynne Castro's damages claims include all the damages that Briandalynne would have been entitled to had she been alive, such as loss of enjoyment of life and pain and suffering, before death occurred. With respect to

---

[4] HRS § 663-7 (1993) ("Survival of cause of action") provides:

A cause of action arising out of a wrongful act, neglect, or default, except a cause of action for defamation or malicious prosecution, shall not be extinguished by reason of the death of the injured person. The cause of action shall survive in favor of the legal representative of the person and any damages recovered shall form part of the estate of the deceased.

7

Castro's claim for negligent infliction of emotional distress, Castro asserted that there was "ample evidence that a normally constituted reasonable person would be unable to adequately cope with the mental stress engendered by Defendants' egregious conduct" and the resulting stillbirth. Castro further added that the fact that she may not have been able to raise or provide for her daughter while in prison "is irrelevant with respect to [Castro's] mental and emotional pain" caused by the stillbirth. Castro requested that the court award her $400,000 for her survivor claims, $250,000 for her emotional distress claims, $600,000 for the Estate of Briandalynne Castro's wrongful death claim, and $800 in special damages for the estate's cremation expenses.

Petitioners also submitted a post-trial memorandum regarding damages. Petitioners first argued that damages should not be awarded because Castro "has not and cannot prove a causal connection between any alleged negligence of the State Defendants and the stillbirth." Petitioners further contended that any award of damages to Castro "must be minimal" because her "conduct at all times prior to the stillbirth was not the conduct of a mother who wanted her baby." They additionally contended that Castro's incarceration meant that "[t]here is absolutely no evidence that [Castro] would have been able to raise her child or

8

have even been able to keep her child." Petitioners concluded by arguing that "an award of $5,000 or less would be an adequate amount to compensate [Castro] for a stillbirth which is not a significant loss to her and for which she has not suffered any emotional distress."

The court entered its Findings of Fact and Conclusions of Law and Order on May 14, 2012, determining that the Petitioners' negligence was the legal cause of Briandalynne's death. The court made the following Findings of Fact (FOFs)[5] relevant to this appeal:

> 18. On July 2, 2007, Plaintiff was seen by OCCC nurse practitioner, Amy Yasunaga, for her first pre-natal visit. Ms. Yasunaga was the primary medical provider responsible for treatment and care of pregnant inmates at OCCC.
>
> 19. Ms. Yasunaga ordered pre-natal vitamins, took Plaintiff's vital signs, measured the fundus, listened to the fetus's heart tones, and ordered an OBGYN consultation and an ultrasound for Plaintiff at Kapiolani Medical Center ("KMC" or "Kapiolani"). Ms. Yasunaga noted no abnormalities or concerns with Plaintiff's pregnancy. Ms. Yasunaga noted Plaintiff's last menstrual period was January 31, 2007.
>
> 20. On that same day, July 2, 2007, OCCC physician, Kenneth Zienkiewicz, M.D., reviewed and approved Ms. Yasunaga's orders for Plaintiff's KMC OBGYN consultation and ultrasound.
>
> . . . .
>
> 22. Both the KMC OBGYN consultation and ultrasound were never done, during the relevant month-long

---

[5]     Petitioners challenged certain FOFs in their appeal to the ICA. Castro v. Melchor, 137 Hawai'i at 185, 366 P.3d at 1064. The FOFs reproduced here either were not challenged, or were upheld by the ICA. Petitioners did not further contest the circuit court's FOFs in their application for certiorari.

9

period, from the time Ms. Yasunaga issued the orders on July 2,2007, until Plaintiff's transfer out of OCCC on August 2, 2007.

23. Within several days of Plaintiff's July 2, 2007 pre-natal visit with Ms. Yasunaga, Plaintiff began experiencing vaginal bleeding. Plaintiff made four to five reports of her vaginal bleeding to various [Adult Corrections Officers (ACOs)], including ACO Hattie Reis, ACO Wanda Nunes, and ACO Reyetta Ofilas.

24. All three ACOs informed the OCCC medical unit of Plaintiff's vaginal bleeding and requested medical attention, but no medical care was provided. The medical unit's response, relayed through the Nurse Defendants was, that if Plaintiff's bleeding was not heavy enough to saturate a sanitary pad, and/or not accompanied by cramping, Plaintiff did not need to be sent to the medical unit.

. . . .

27. Up until Plaintiff's transfer out of OCCC on August 2, 2007, Plaintiff did not receive any medical care for her four to five complaints of vaginal bleeding, and was never sent to the OCCC Medical Unit.

28. During Plaintiff's entire stay at OCCC, Plaintiff was on segregation status, from July 2 to August 2, 2007. The pertinent DPS and OCCC Policies and Procedures for medical care for segregated inmates . . . were not followed, and no medical staffer ever checked on, or communicated with Plaintiff, about her bleeding complaints. Nor was Plaintiff ever brought to the OCCC Medical Unit for evaluation of her complaints.

. . . .

30. Plaintiff was transferred to WCCC on August 2, 2007. According to WCCC nurse Jennifer Simeona, who conducted Plaintiff's intake on that date, Plaintiff's Interfacility Transfer Form from OCCC, did not contain any information to let Nurse Simeona know, that the KMC OBGYN evaluation and ultrasound ordered on July 2, 2007, were still outstanding and never done. Any outstanding medical orders should have been included on the form.

. . . .

34. The WCCC midwife could not detect any fetal heart tones from Plaintiffs fetus. Plaintiff "broke down" crying but tried to not lose hope. The midwife ordered that Plaintiff be immediately transported to KMC.

35. Plaintiff was taken to KMC via emergency transport, on that same date, August 10, 2007, where an ultrasound confirmed that the fetus was dead. Labor was induced, and Plaintiff's fetus, Briandalynne Castro . . . was delivered stillborn on August 11, 2007.

36. On August 14,2007, an autopsy of [Briandalynne] was performed in the usual course by Jeffrey Killeen, M.D. ("Dr. Killeen"), KMC Director of Pathology.

37. Dr. Killeen's autopsy findings and conclusions indicated, inter alia, that the pregnancy was "term or near-term", [the stillbirth] appeared to be related to "intrauterine events occurring at the time of vaginal bleeding", and that, more likely than not, death was related to a placental abruption. A placental abruption, is a separation of the placenta from the uterus, causing a disconnect between the maternal blood supply and placental nutrition from the maternal circulation.

38. Dr. Killeen's autopsy findings also confirmed that [Briandalynne] had no congenital or developmental abnormalities.

39. On or around October 22, 2008, Dr. Killeen conducted further evaluation and testing to determine the approximate date of [Briandalynne]'s death and supplemented his autopsy report with an Addendum containing his findings.

40. As a result of this further examination of the fetus, placenta, and multiple organs, Dr. Killeen opined that "the time interval between fetal death and delivery is estimated to be greater than 96 hours, more likely 7 days or more, and less than 14 days.["] Dr. Killeen's findings, placed the date of death, within a reasonable degree of medical probability, as between July 29, 2007 and August 4, 2007. Dr. Killeen also indicated that the age of the fetus, was 35 to 37 weeks of gestation

. . . .

56. The evidence established that [Briandalynne had] no congenital or development abnormalities. Despite the incarcerated status of her mother,[Briandalynne's] life and her loss of enjoyment of life, are of the nature and kind of any other infant.

57. An award of damages against Defendant State, in the amount of $250,000.00 to the Estate of Briandalynne Castro, is fair and appropriate, for the State's share of the Estate's total damages.

11

The court also made the following relevant Conclusions of Law (COLs):

> 74.  Under Hawaii's wrongful death statute, a parent of a stillborn viable fetus, such as Plaintiff herein, is entitled to sue for the wrongful death of the fetus. Wade v. U.S., 745 F. Supp. 1573, 1579 (D. Haw. 1990).
>
> . . . .
>
> 81.  Based on all the facts and circumstances, an award of damages against Defendant State, in the amount of $350,000.00 to Plaintiff individually ($250,000.00 for NIED and $100,000.00 for loss of filial consortium), is fair and appropriate, for the State's share of Plaintiff's total damages.
>
> 82.  The Estate's claim, under HRS § 663-7, is the cause of action and recovery that [Briandalynne] would have been entitled to at death for the injuries caused by Defendant State's negligence. Ozaki v. Assn of Apt. Owners, 87 Hawaiʻi 273, 288, 954 P.2d 652, 667 (App. 1998), aff'd in part and reversed in part on other grounds, 87 Hawaiʻi 265, 954 P.2d 644 (1998). The Estate's damages include damages for the loss of enjoyment of life, or for the value of life itself, measured separately from the economic productive value that the deceased would have had. Montalvo v. Lapez, 77 Hawaiʻi 282, 284 n.2, 884 P.2d 345, 347 n.2 (1994).
>
> 83.  The Estate's damages include the value for the loss of life itself and for all of the damages that [Briandalynne] would have been entitled to had she been alive, such as loss of enjoyment of life.  The evidence established that the [Briandalynne had] no congenital or development abnormalities.  Despite the incarcerated status of her mother, [Briandalynne]'s life and her loss of enjoyment of life, are of the nature and kind of any other infant.  An award of damages against Defendant State, in the amount of $250,000.00 to the Estate of Briandalynne Castro, is fair and appropriate, for the State's share of the Estate's total damages.

The court thus entered final judgment in Castro's favor and awarded her $350,000 individually and $250,000 as the representative of Briandalynne's estate.

12

**B.   Petitioners' Appeal to the ICA**

Petitioners appealed to the ICA, arguing, <u>inter</u> <u>alia</u>, that the circuit court's award of damages to the estate of the fetus was error and that the damages awarded to both Castro and Briandalynne's estate were speculative and improper.

On January 29, 2016, the ICA issued its Published Opinion affirming the circuit court's judgment.  <u>Castro v.</u> <u>Melchor</u>, 137 Hawai'i at 182, 366 P.3d at 1061.

The ICA first considered the HRS § 663-3 wrongful death action.  With respect to whether a wrongful death claim may be brought on behalf of a stillborn, viable fetus, the ICA noted that Hawaii's appellate courts have not previously addressed the issue, and that the legislative history of HRS § 663-3 does not reveal whether or not the Legislature intended the statute to apply to unborn, viable fetuses.  <u>Id.</u> at 186, 366 P.3d at 1065. According to the ICA, "only six states--California, Florida, Iowa, Maine, New Jersey, and New York--prohibit wrongful death claims from being brought on behalf of unborn children[,]" while "forty-one states and the District of Columbia permit wrongful death actions to be brought on behalf of unborn, viable fetuses." <u>Id.</u>  The ICA explained that "thirty-five jurisdictions first recognized such a claim by judicial decision, while fourteen states now expressly allow such a claim by statute."  <u>Id.</u> at 187,

13

366 P.3d at 1066. The ICA stated that it found "compelling reasons to join this overwhelming majority." Id.

The ICA rejected Petitioners' argument that it would be inconsistent to include fetuses within the definition of "person" in HRS § 663-3 when the Hawai'i Supreme Court has held that a fetus is not a person in the Hawai'i Penal Code. Id. The ICA rejected this argument, noting that "Hawai'i is one of only nine states that still apply the 'born alive' rule and have not amended their criminal homicide statutes to include unborn children as victims[,]" and that seven of those nine states-- Connecticut, Delaware, New Hampshire, New Mexico, Oregon, Vermont, and Washington--"allow a cause of action for the wrongful death of an unborn, viable fetus." Id. at 188-89, 366 P.3d at 1067-68. The ICA thus held that "the existence of the 'born alive' rule in a state's penal code clearly does not foreclose the existence of a cause of action for the wrongful death of a viable fetus." Id. at 189, 366 P.3d at 1068. The ICA reasoned that this was logical based "on the well-established principle that, while civil causes of action are remedial in nature and therefore are generally construed liberally, criminal statutes are construed strictly and in favor of the accused." Id.

14

The ICA was persuaded by policy considerations that the majority jurisdictions relied on--"the remedial nature and purposes of the wrongful death remedy, and the injustice in allowing a tortfeasor to escape liability by inflicting greater harm."  Id. at 190, 366 P.3d at 1069.  The ICA held:

> Pursuant to Hawaiʻi precedent, remedial statutes are to be liberally interpreted. Kalima v. State, 111 Hawaiʻi 84, 100, 137 P.3d 990, 1006 (2006). "Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries." Id. (citations and internal quotation marks omitted). Inasmuch as "[t]he purpose of damages in wrongful death and survival statutes is compensation for loss, not punishment," and HRS § 663–3 creates a statutory right for non-dependent relatives to sue for wrongful death, a right which did not exist under common law, we conclude that this statute is remedial in nature. Greene v. Texeira, 54 Haw. 231, 505 P.2d 1169, 1170 (1973).

Id. at 189-90, 366 P.3d at 1068-69.

The ICA further noted that, "in Hawaiʻi, a child who is subsequently born alive may recover damages for negligently inflicted prenatal injuries."  Id. at 190, 366 P.3d at 1069 (citing Omori v. Jowa Haw. Co., Ltd., 91 Hawaiʻi 157, 161–62, 981 P.2d 714, 718-19 (App.1999), aff'd as modified, 91 Hawaiʻi 146, 981 P.2d 703 (1999)).  Thus, it held that allowing a cause of action in a case where a viable fetus is injured but the child is born, while foreclosing a cause of action where the unborn child dies before birth, "would lead to the absurd and illogical result that greater harm results in a better chance of immunity."  Id. at 190-91, 366 P.3d at 1069-70.

15

The ICA turned to HRS § 663-7 survival actions in its discussion of damages. Id. at 198, 366 P.3d at 1077. It noted in a footnote that not all states have distinct wrongful death statutes and survival statutes, and acknowledged that the varying forms of statutes and remedies and the evolving jurisprudence made generalizations about the application of survival-of-claim statues to claims on behalf of viable, unborn fetuses much more complicated. Id. at 198 n.17, 366 P.3d at 1077 n.17. However, it stated that seventeen states and the District of Columbia recognized at least some sort of personal injury claims that survive the death of the viable, unborn fetus. Id. It then affirmed the trial court's award of loss of life damages to Briandalynne's estate. While the ICA did not make an explicit ruling, by affirming the damages award, the ICA implicitly held that the estate of a viable, unborn fetus may bring a survival action pursuant to HRS § 663-7.

The ICA rejected Petitioners' argument that Castro was foreclosed from being awarded damages under HRS § 663-7, the survival statute, and was limited to damages under HRS § 663-3, the wrongful death statute. Id. at 199, 366 P.3d at 1078. The ICA explained that although "Castro did not reference HRS § 663-7 in her complaint, a plaintiff's failure to cite the statutory basis for her claim does not automatically render the complaint

16

defective or insufficient." Id. Quoting our decision in In re Genesys Data Technologies, Inc., 95 Hawaiʻi 33, 41, 18 P.3d 895, 903 (2001), the ICA stated that our "rules of notice pleading require that a complaint set forth a short and plain statement of the claim that provides defendant with fair notice of what the plaintiff's claim is and the grounds upon which the claim rests" and that "[p]leadings must be construed liberally." Id. (internal citations omitted). According to the ICA, "a liberal reading of Castro's complaint would put the State on notice" that Castro was bringing "a claim on behalf of Briandalynne's estate," that "the claim arose out of the State's negligence resulting in Briandalynne's death," and that "she would be pursuing general damages in an amount to be proven at trial, which could include damages for the loss of enjoyment of life." Id. at 200, 366 P.3d at 1079. Thus, the ICA held that Castro's complaint "was not insufficient" because it "reasonably informed the State of what Castro's claims were, their basis, and what the State would have to defend against." Id.

The ICA further held that there was sufficient evidence to support an award of damages to Briandalynne's estate. Id. The ICA pointed to the testimony of a doctor who examined Castro, who stated that "he could not find any 'gross congenital anomalies'" nor "abnormalities of any kind" during his

17

examination of Briandalynne as sufficient evidence to support the court's finding that the fetus had no congenital or development abnormalities.  Id. at 201, 366 P.3d at 1080.  Finally, the ICA rejected Petitioners' argument challenging the award of $100,000 to Castro for loss of filial consortium and the award of $250,000 for emotional distress.  Id. at 201-02, 366 P.3d at 1080-81.

The ICA entered its Judgment on Appeal pursuant to its Opinion on February 29, 2016.

### III. Standards of Review

### A. Findings of Fact (FOF)/Conclusions of Law (COL) - Civil

"In this jurisdiction, a trial court's FOFs are subject to the clearly erroneous standard of review.  An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed."  Chun v. Bd. of Trs. of the Emp. Ret. Sys. of State of Hawai'i, 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005) (internal quotation marks, citations, and ellipses omitted) (quoting Allstate Ins. Co. v. Ponce, 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004)).

> A COL is not binding upon an appellate court and is freely reviewable for its correctness.  [The appellate court] ordinarily reviews COLs under the right/wrong standard.  Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned.  However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's

18

> conclusions are dependent upon the facts and
> circumstances of each individual case.

Chun, 106 Hawai'i at 430, 106 P.3d at 353 (internal quotation

marks, citations, and brackets in original omitted) (quoting

Ponce, 105 Hawai'i at 453, 99 P.3d at 104).

## B.    Damages

"We shall not disturb the findings of the trial court

on the issue of damages . . . unless we find that the measure of

damages was clearly erroneous[.]"  Viveiros v. State, 54 Haw.

611, 614, 513 P.2d 487, 489 (1973).

## C.    Statutory Interpretation

> Questions of statutory interpretation are questions of
> law to be reviewed de novo under the right/wrong
> standard.
>
> Our statutory construction is guided by the following
> well established principles:
>
> Our foremost obligation is to ascertain and give
> effect to the intention of the legislature, which is
> to be obtained primarily from the language contained
> in the statute itself.  And we must read statutory
> language in the context of the entire statute and
> construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or
> indistinctiveness or uncertainty of an expression used
> in a statute, an ambiguity exists.
>
> In construing an ambiguous statute, the meaning of the
> ambiguous words may be sought by examining the
> context, with which the ambiguous words, phrases, and
> sentences may be compared, in order to ascertain their
> true meaning.  Moreover, the courts may resort to
> extrinsic aids in determining legislative intent.  One
> avenue is the use of legislative history as an
> interpretive tool.
>
> The [appellate] court may also consider the reason and
> spirit of the law, and the cause which induced the
> legislature to enact it to discover its true meaning.

19

Lingle v. Hawaiʻi Gov't Emp. Ass'n, AFSCME, Local 152, AFL-CIO, 107 Hawaiʻi 178, 183, 111 P.3d 587, 592 (2005) (internal quotation marks, brackets and ellipses omitted) (quoting Guth v. Freeland, 96 Hawaiʻi 147, 149-50, 28 P.3d 982, 984-85 (2001)).

## IV. Discussion

Petitioners present two questions in their application for certiorari:

> A. Whether the award of loss of enjoyment of life damages for a stillborn fetus was error.
>
> B. Whether the award of $250,000 damages to the estate of Briandalynne Castro was error when there was no evidence presented to justify that monetary amount.

This case thus presents the narrow question of whether the estate of a stillborn fetus may recover loss of enjoyment of life damages under Hawaii's survival statute, HRS § 663-7.[6]

"Hedonic" damages are damages "for the loss of enjoyment of life, or for the value of life itself, as measured separately from the economic productive value that an injured or

---

[6] Under Hawaii's survival statute, HRS § 663-7, the legal representative of a decedent's estate may recover damages on behalf of the decedent's estate. Under Hawaii's wrongful death statute, HRS § 663-3, specified relatives of a decedent can bring a wrongful death action against the person responsible for causing the decedent's death.

We do not address the circuit court's award of damages for loss of filial consortium pursuant to HRS § 663-3, the wrongful death statute, because Petitioners did not challenge this holding of the ICA in their application for writ of certiorari. See Hawaiʻi Rules of Appellate Procedure Rule 40.1(d)(1) ("Questions not presented according to this paragraph will be disregarded.").

However, we discuss the legislative history of both statutes below, because the survival statute, HRS § 663-7, was implemented as part of a bill that revised and expanded the wrongful death statute, HRS § 663-3.

deceased person would have had." Montalvo v. Lapez, 77 Hawai'i 282, 284 n.2, 884 P.2d 345, 347 n.2 (1994) (quoting Black's Law Dictionary 391 (6th ed. 1990)). "Many tortious acts-- particularly involving negligence . . . inflict on the victim what is loosely termed a 'loss of the enjoyment of life,' or a loss of life's pleasures, or the incapacity to lead a normal life, the inability to enjoy one's family, or games, sports, hobbies, avocational skills, and the like." 2 Stuart M. Speiser et al., The American Law of Torts § 8:20 (2014).

Petitioners contend that the circuit court erred in (1) allowing a viable fetus to recover hedonic damages, and (2) awarding $250,000 in damages when there was no evidence regarding the loss of enjoyment of life for Briandalynne, had she lived. In response, Castro argues that the damages award was appropriate because "[t]here is no reason why the amount of general damages for the loss of a life and the loss of a person's enjoyment of life in the case of a stillborn child cannot be determined" using the same factors that courts consider when an infant "is a victim of wrongful death." Castro argues that appellate courts will not disturb the findings of the trial court on damages unless they are clearly erroneous, and that Petitioners' have not adduced any evidence or authority to support such a contention.

We conclude that the relevant statutes, applicable case law, and policy considerations, support Castro's contention that the estate of an unborn, viable fetus is able to recover hedonic damages.  We also find that there was sufficient evidence to support the circuit court's damages award.  Accordingly, we conclude that the ICA did not err in affirming the circuit court's award of damages for loss of enjoyment of life.

## A.   The circuit court did not err in allowing a viable fetus to recover hedonic damages.

Hedonic damages are "indisputably" recoverable in Hawaiʻi, as "HRS § 663-8.5(a) (Supp. 1992)[7] provides that noneconomic damages which are recoverable in tort actions include damages for pain and suffering, mental anguish, disfigurement, loss of enjoyment of life, loss of consortium, and all other nonpecuniary losses or claims."  Montalvo, 77 Hawaiʻi at 301, 884 P.2d at 364 (brackets and internal quotation marks omitted) (emphasis in original).  Children may recover hedonic damages for injuries sustained in the womb.  See Omori, 91 Hawaiʻi at 162, 981 P.2d at 719.

---

[7]    HRS 663-8.5(a) (Supp. 1992) ("Noneconomic damges; defined") provides:

> (a) Noneconomic damages which are recoverable in tort actions include damages for pain and suffering, mental anguish, disfigurement, loss of enjoyment of life, loss of consortium, and all other nonpecuniary losses or claims.

22

There is no question, and Petitioners do not dispute, that a decedent's estate can recover damages for loss of enjoyment of life under the survival statute, HRS § 663-7, which provides:

> A cause of action arising out of a wrongful act, neglect, or default, except a cause of action for defamation or malicious prosecution, shall not be extinguished by reason of the death of the injured person. The cause of action shall survive in favor of the legal representative of the person and any damages recovered shall form part of the estate of the deceased.

HRS § 663-7; see also Ozaki, 87 Hawai'i at 288, 954 P.2d at 667 (holding that under HRS § 663-7, the estate of murdered tenant could assert loss of enjoyment of life claim that she had at time of her death).

Rather, Petitioners argue that it is inappropriate to award hedonic damages to the estate of a viable fetus. In support, Petitioners quote a leading treatise on personal injury, suggesting that hedonic damages are inappropriate in situations in which the decedent was killed instantly: "[i]n a survival action, a decedent's estate generally may be allowed to recover hedonic damages for the time between injury and death." Petitioners also argue that there must be evidence of how a decedent enjoyed life, and a fetus cannot suffer hedonic damages, since the fetus has not had time to develop the ability to have loss of enjoyment of life damages.

23

Petitioners' arguments fail for four reasons.  First, the legislative history supports a finding that the legislature did not intend to exclude a viable fetus from an HRS § 663-7 survival action, but rather intended that recovery be as broad as possible.  This is consistent with the well-established principle that remedial statutes should be liberally construed.  Kalima v. State, 111 Hawai'i 84, 100, 137 P.3d 990, 1006 (2006).  Second, Hawai'i case law is unique because it does not require the decedent to have actually experienced the loss of enjoyment of life to recover hedonic damages.  Third, disallowing hedonic damages in this situation would not adequately compensate the injured party.  Fourth, children may recover hedonic damages for injuries sustained in the womb; accordingly, disallowing hedonic damages to viable, unborn fetuses under HRS § 663-7 would provide perverse incentives to the tortfeasor.

In interpreting a statute, we start with our foremost obligation: to ascertain and give effect to the intention of the legislature.  See Morgan v. Planning Dep't, Cty. of Kauai, 104 Hawai'i 173, 179, 86 P.3d 982, 988 (2004).  Because it is not clear from the plain language of the statute whether HRS § 663-7 would apply to a viable, unborn fetus, we must look at the statute's legislative history.  See id.  In reviewing the legislative history of HRS § 663-7, the survival statute, there

24

is nothing to suggest that the legislature intended to exclude a viable fetus from an HRS § 663-7 survival action.  Rather, the legislature expressly provided that recovery under the survival statute be "broad" and endorsed this court's broad judicial interpretation of the wrongful death statute, HRS § 663-3  which was revised as part of the same bill in which HRS § 663-7, the survival statute, was implemented.

House Bill 588 of 1955 revised the 1923 wrongful death statute, HRS § 663-3, and implemented for the first time the survival statute, HRS § 663-7.  In relevant part, the House Judiciary Committee stated as follows:

> 1. The purpose of this bill is to broaden the right of action and the extent of recovery in wrongful death suits.
>
> . . . .
>
> 3. This bill, as amended, broadens the wrongful death statute by permitting a deceased person's spouse, children, father, mother, or dependents to recover for the wrongful death of the deceased. . . .
>
> The right of action under the present wrongful death action is based on the archaic principal of dependency.  The provisions of this bill are consistent with the theory of the majority of the statutes in the United States.  This bill permits recovery for not only pecuniary losses but also for loss of love and affection, including (1) loss of society, companionship, comfort, consortium or protection, (2) loss of marital care, attention, advice or counsel, (3) loss of filial care or attention or, (4) loss of parental care, training, guidance or education.
>
> 4. The provisions of this bill follow, in substance, the doctrine of the case of Gabriel [v]. Margah, 37 Haw. 571, which extended the interpretation of the existing statutory right of action.
>
> 5. This bill also provides for a survival statute.  In

25

the majority of the states in the United States, broad survival statutes have been passed to permit the survival of right of action arising out of a tort despite the death of the wrongdoer or of the injured person.

Under the common law, death terminated the right of action arising out of a tort. This archaic doctrine has caused untold hardship and injustice.

The present Territorial statutes are not broad enough to cover all of the hardship situation which might arise and your Committee feels that this bill will help fill a void in the tort laws of the Territory.

H. Stand. Comm. Rep. No. 581, in 1955 House Journal, at 772-73 (emphasis added).

The spirit and intent of the law was that both the wrongful death statute, HRS § 663-3, and the survival statute, HRS § 663-7, be broad remedial statutes. The legislature expressly provided that it was adopting a survival statute because the majority of the states had passed "broad" survival statutes, and that the tort laws of the Territory were "not broad enough." Id. at 773.

Regarding the amendments to HRS §663-3, the wrongful death statute, the legislature explained that it was adopting and codifying the Hawaiʻi Supreme Court's broad remedial interpretation of the wrongful death statute in Gabriel, 37 Haw. 571.

The Gabriel court explained that Hawaiʻi adopted a common law cause of action in 1860 by which a husband or wife could recover for the wrongful death of his or her spouse, and

26

that in 1905, the Hawai'i Supreme Court held that a father could recover for the death of his minor child . Id. at 575-77 (citing Kake v. C.S. Horton, 2 Haw. 209 (1860); Ferreira v. Honolulu R. T. & L. Co., 16 Haw. 615 (1905)). The Gabriel court explained that in Hall v. Kennedy, 27 Haw. 626 (1923), the court held that a father could not recover for the death of an adult son upon whom the father was dependent for support. Id. at 579. In response to Hall, the legislature enacted the wrongful death act of 1923, which provided that any person dependent on the deceased person could maintain an action for damages against the person causing the death. Id.

In Gabriel, parents sought to recover for the death of their minor child, and the defendants argued that the 1923 statute had superseded the common law right of recovery for wrongful death, and that only those dependent on the deceased could recover under the statute. Id. at 572. The Gabriel court held that the statute had not superseded the common law right--and thus that the parents could recover for the death of their minor child. Id. at 582.

Thus, the 1955 revision of HRS § 663-3--the wrongful death statute--adopted and codified the Hawai'i Supreme Court's broad remedial interpretation of the statute. The legislature clarified that anyone in specified relationships with the

27

deceased, regardless of dependency, could recover under the statute, and that anyone dependent on the deceased, regardless of relationship, could recover under the statute. HRS § 663-3.

Because the legislature endorsed and adopted the Hawai'i Supreme Court's broad interpretation of HRS § 663-3, and because the survival action, HRS § 663-7, was implemented as part of the same act as the legislative revision to HRS § 663-3, it follows that the intent of the legislature was to provide for broad recovery under both statutes, and to endorse broad judicial interpretation of both statutes. Accordingly, interpreting HRS § 663-7 to provide recovery for viable, unborn fetuses is consistent with the legislature's intent to provide broad recovery under the wrongful death and survival statutes.

Construing HRS § 663-7 to provide recovery for viable, unborn fetuses is also consistent with our guiding principle that remedial statutes should be liberally construed. See Kalima, 111 Hawai'i at 100, 137 P.3d at 1006. HRS § 663-7 is a remedial statute. See Greene, 54 Haw. at 236, 505 P.2d at 1173 ("Our interpretation of HRS § 663-7 recognizes that the aim of the statutes in this area of the law is compensation for loss[.]") "This court has stated that remedial statutes should be liberally construed to suppress the perceived evil and advance the enacted remedy and has disfavored narrow interpretations that impede

28

rather than advance the remedies provided by such statutes."
Kalima, 111 Hawaiʻi at 100, 137 P.3d at 1006 (internal citations
omitted).[8]

Second, we reject Petitioners' arguments that a
decedent must experience consciousness of her loss of enjoyment
of life and that there must be evidence of how a decedent enjoyed

___

[8] Justice McKenna argues that our common law provides that whether wrongful death liability exists is an issue to be decided by the legislature. Opinion of McKenna, J. at 38 (citing Lealaimatafao v. Woodward-Clyde Consultants, 75 Haw. 544, 551, 867 P.2d 220, 224 (1994)). However, Lealaimatafao makes clear that this court's obligation is to ascertain and give effect to the intention of the legislature. 75 Haw. at 551, 867 P.2d at 224. Because the intent of the legislature is to permit broad recovery under the survival statute, we disagree with Justice McKenna that the ICA erred by attempting to "create" liability under common law. Opinion of McKenna, J. at 38. Justice McKenna also cites for support to the Restatement (Second of Torts) § 869 (1979), which provides:

> (1) One who tortiously causes harm to an unborn child is subject to liability to the child for the harm if the child is born alive.
> (2) If the child is not born alive, there is no liability unless the applicable wrongful death statute so provides.

Opinion of McKenna, J. at 37 (citing Restatement (Second) of Torts, § 869).

However, the comments to § 869 further provide:

> If the child is not born alive, there may still be the possibility of an action for its wrongful death, brought by the proper person under the wrongful death statute of the particular jurisdiction. Whether this action can be maintained will depend upon the language of the applicable statute and its construction by the court in determining whether the statute is intended to create the cause of action. The language of the statutes varies and no general rule can be stated for their construction.

Restatement (Second) of Torts, § 869, cmt. f.

life, as we are persuaded by the ICA's decision in Polm v. Dep't of Human Servs., 134 Hawai'i 305, 339 P.3d 1106, 2014 WL 7390879 at *21 (App. 2014). There, the ICA affirmed the circuit court's order finding the Department of Human Services liable for damages to a one-year-old child's estate. Id. The defendant had argued that "since [the Decedent] lost consciousness almost immediately and there was no evidence of how he had enjoyed life or how he would have enjoyed life, only minimal damages could be awarded for loss of enjoyment of life." Id. (internal quotation marks omitted). The ICA rejected these arguments and awarded damages under HRS § 663-7. Id. Other jurisdictions have also held that consciousness is not required to recover loss of enjoyment of life damages. See Holston v. Sisters of Third Order of St. Francis, 165 Ill. 2d 150, 650 N.E.2d 985 (1995)(holding that damages may be awarded for the loss of enjoyment of life to a disabled person even if she was unaware of her loss); Flannery v. United States, 171 W. Va. 27, 33, 297 S.E.2d 433, 439 (1982) (holding comatose patient could recover loss of enjoyment of life damages "even though he may not be able to sense his loss of enjoyment of life").

Third, disallowing hedonic damages in this situation would not adequately compensate Briandalynne's estate. Under HRS § 663-8.5(a), Briandalynne's estate could recover damages for

30

"pain and suffering, mental anguish, disfigurement, loss of enjoyment of life, loss of consortium, and all other nonpecuniary losses or claims."  However, it is unclear to what extent Briandalynne could have recovered for pain and suffering, since our case law requires consciousness.  See Brown v. Clark Equip. Co., 62 Haw. 530, 537, 618 P.2d 267, 272 (1980) ("Rohlfing . . . established the rule that recovery for pain and suffering depended on the existence of conscious pain and suffering.") (emphasis added).  Accordingly, hedonic damages may be the only way to appropriately compensate Briandalynne's estate for her injury.

Fourth and finally, to not allow hedonic damages in this case would create perverse incentives for the tortfeasor. In Omori, the ICA held that children may recover hedonic damages for injuries sustained in the womb.  91 Hawai'i at 162, 981 P.2d at 719.  Policy considerations counsel against barring recovery of hedonic damages for the death of a viable, unborn fetus under the survival statute, but allowing a child who is tortuously injured while in the womb to bring a negligence claim for damages after birth.  See Ozaki, 87 Hawai'i at 289, 954 P.2d at 668.  In Ozaki, the ICA held that the estate of an adult decedent could recover damages for loss of enjoyment of life under HRS § 663-7. Id.  In so holding, the ICA relied on the concurring opinion in

Jones v. Shaffer:

> A person tortiously injured, and permanently disabled
> in consequence, may recover for the diminished joy of
> living. . . .  If this view does not hold in wrongful
> death cases, our law gives off unfortunate incentives.
> We invite the tortfeasor who runs over a pedestrian to
> back up and do it again and be sure his victim is
> dead.

573 So. 2d 740, 746 (Miss. 1990) (concurring opinion).

Thus, based on the survival statute's legislative history, Hawai‘i precedent, and policy considerations, we hold that Briandalynne's estate was properly allowed to recover damages for loss of enjoyment of life.

This holding would not subject to civil liability a woman carrying a fetus whose negligence caused the viable fetus to die in utero or who exercised her rights under the law to terminate a pregnancy through abortion.

Regarding negligence, the question of whether recovery is possible under HRS § 663-7 and whether a legal duty of care exists are two separate inquiries.  HRS § 663-7 does not define against whom a decedent's estate may sue, and its legislative history does not manifest intent on the part of the legislature to impose a legal duty of care on particular defendants. Accordingly, the existence of a legal duty of care for recovery under HRS § 663-7 is a question of law for the courts to decide. Ah Mook Sang v. Clark, 130 Hawai‘i 282, 290, 308 P.3d 911, 919 (2013).

32

> In considering whether to impose a duty of reasonable care on a defendant, we recognize that duty is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. Legal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done. In determining whether or not a duty is owed, we must weigh the considerations of policy which favor the appellants' recovery against those which favor limiting the appellees' liability.

Id. at 291, 308 P.3d at 920.

Based on significant policy considerations, we agree with the jurisdictions that have held as a matter of law that a pregnant woman does not owe a legal duty of care to the fetus she carries. See Remy v. MacDonald, 440 Mass. 675, 682-83, 801 N.E.2d 260, 266-67 (2004) (holding that a mother did not owe a legal duty of care to her unborn fetus, noting "inherent and important differences between a fetus, in utero, and a child already born" and that "[r]ecognizing a pregnant woman's legal duty of care . . . to her unborn child would present an almost unlimited number of circumstances that would likely give rise to litigation"); Stallman v. Youngquist, 125 Ill. 2d 267, 279-80, 531 N.E.2d 355, 361 (1988)(holding no legal duty, and noting "[j]udicial scrutiny into the day-to-day lives of pregnant women would involve an unprecedented intrusion into the privacy and autonomy of the citizens of this State"); Chenault v. Huie, 989 S.W.2d 474, 476-77 (Tex. App. 1999) (finding no legal duty and

stressing "[t]he extent of interference with a woman's legal rights that could occur as a result of imposing a legal duty to the fetus").

Similarly, a holding that Briandalynne's estate can recover loss of enjoyment of life damages under HRS § 663-7 would not affect or interfere with a woman's right under the law to terminate a pregnancy through abortion. Other jurisdictions which have interpreted wrongful death or survival statutes to provide recovery for the death of a viable, unborn fetus have made clear that the holding would not affect abortion rights. See, e.g., Strzelczyk v. Jett, 264 Mont. 153, 158, 870 P.2d 730, 733 (1994) (Gray, J., concurring) (making clear, in its holding that a wrongful death statute covered an unborn fetus that, "this is not an abortion case or a case related in any way to a woman's constitutional right to privacy and to an abortion . . . The termination of a pregnancy by abortion is an intentional, consensual act by a woman and her physician which the law specifically allows" while a wrongful death action is based on negligence).

**B.    The circuit court's award of $250,000 in damages to Briandalynne's estate was not in error.**

In their second question presented, Petitioners argue that the circuit court erred in awarding $250,000 in damages to Briandalynne's estate "when there was no evidence presented to

34

justify that monetary amount." For support, Petitioners cite to Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co., in which we held that "[i]t is well-settled that all tort claims require that damages be proven with reasonable certainty." 116 Hawaiʻi 277, 292, 172 P.3d 1021, 1036 (2007).

Generally, we do not disturb the findings of the trial court on the issue of damages absent a clearly erroneous measure of damages. See Viveiros, 54 Haw. at 614, 513 P.2d at 489; Johnson v. Sartain, 46 Haw. 112, 114, 375 P.2d 229, 230-31 (1962) ("[D]amages . . . will not be disturbed on appellate review unless palpably not supported by the evidence, or so excessive and outrageous when considered with the circumstances of the case."). With respect to Briandalynne's damages, the circuit court made the following FOF, which Petitioners do not challenge in their application for certiorari:

> 56. The evidence established that [Briandalynne had] no congenital or development abnormalities. Despite the incarcerated status of her mother, [Briandalynne's] life and her loss of enjoyment of life, are of the nature and kind of any other infant.

The circuit court also made the following COLs:

> 72. Had Plaintiff's medical care been consistent with the applicable standard of care, such as a consultation with an OBGYN and an ultrasound evaluation by as late as July 29, 2007, Plaintiff's bleeding condition would have been detected and treated; or if the bleeding condition could not have been corrected, delivery would have been initiated and [Briandalynne] would have been born alive.

> 73. Defendant State's negligence was the legal cause of the death of [Briandalynne], and Plaintiff's

35

> injuries and damages.  Had medical care for [Castro
> and Briandalynne] been provided consistent with the
> applicable standard of care after July 2, 2007 and
> before July 29, 2007, delivery of a live baby would
> have been accomplished.
>
> . . . .
>
> 83.  The Estate's damages include the value for the
> loss of life itself and for all of the damages that
> [Briandalynne] would have been entitled to had she
> been alive, such as loss of enjoyment of life.  The
> evidence established that [Briandalynne had] no
> congenital or development abnormalities.  Despite the
> incarcerated status of her mother, [Briandalynne's]
> life and her loss of enjoyment of life, are of the
> nature and kind of any other infant.  An award of
> damages against Defendant State, in the amount of
> $250,000.00 to the Estate of Briandalynne Castro, is
> fair and appropriate, for the State's share of the
> Estate's total damages.

Based on this record, the circuit court's damages award was not clearly erroneous.  The $250,000 was appropriately based on the evidence at trial that showed, for example, that Briandalynne would have been born a healthy child, and that her loss of enjoyment of life would be similar to that of any other infant.  This award is also comparable to other damage awards for similar conduct.  See Polm, 2014 WL 7390879 at *21 (affirming circuit court's order awarding $250,000 in damages to one-year-old child's estate).

Contrary to Petitioners' argument, Respondents were not required to present specific evidence of Briandalynne's life expectancy or make calculations regarding her loss of enjoyment of life.  This is not a case in which damages were capable of ascertainment by calculation.  As we noted in Montalvo:

36

> The measurement of the joy of life is intangible. A jury may draw upon its own life experiences in attempting to put a monetary figure on the pleasure of living. It is a uniquely human endeavor . . . requiring the trier of fact to draw upon the virtually unlimited factors unique to us as human beings. Testimony of an economist would not aid the jury in making such measurements because an economist is no more expert at valuing the pleasure of life than the average juror. [T]he loss of enjoyment of life resulting from a permanent injury is . . . not subject to an economic calculation.

77 Hawaiʻi at 303, 884 P.2d at 366 (emphases added; citations and internal quotations omitted).

Thus, given its findings, we conclude that the circuit court was within its discretion to set $250,000 as the appropriate compensation for Briandalynne's injury.

## V. Conclusion

For the foregoing reasons, we hold that Briandalynne's estate could maintain a survival action against Petitioners for hedonic damages, and that the circuit court did not err in awarding the estate $250,000 in damages for loss of enjoyment of life. Accordingly, we affirm the ICA's judgment on appeal.

Marie Manuele Gavigan
for petitioners

Sue V. Hansen for
respondent Leah Castro

/s/ Mark E. Recktentwald

/s/ Michael D. Wilson



37